TAYLOR, C.J.
As a preliminary matter, this opinion addresses the issues raised on appeal in this case. By a separate opinion in this case, the signers of this majority opinion, Chief Justice TAYLOR, Justice CORRIGAN, Justice YOUNG, and Justice Markman, respond to the allegations of Justice WEAVER regarding our suitability to sit in this case.
In this case, we conclude that certain remarks by attorney Geoffrey N. Fieger about the appellate judges who were hearing his client’s case violated MRPC 3.5(c) (which prohibits undignified or discourteous conduct toward the tribunal) and MRPC 6.5(a) (which requires a lawyer to treat with courtesy and respect all persons involved in the legal process), and that those rules (sometimes referred to as “courtesy” or “civility” rules) are constitutional. Accordingly, we reverse the opinion and order of a divided Attorney Discipline Board (ADB) that incorrectly concluded the rules were unconstitutional and remand for the imposition of the agreed-to professional discipline, a reprimand, on Mr. Fieger.
I. FACTS AND PROCEEDINGS BELOW
In 1997, a jury in the Oakland Circuit Court returned a $15 million verdict in a medical malpractice action in which Mr. Fieger represented the plaintiff Salvatore Badalamenti. On appeal, the defendants hospital and physician claimed that the verdict was based on insufficient evidence and that they had been denied their constitutional right to a fair trial by Mr. Fieger’s intentional misconduct. After hearing argument, a three-judge panel of the Court of Appeals, JANE MARKEY, *236 Richard Bandstra, and Michael Talbot, unanimously ruled on August 20, 1999, that the defendants were entitled to judgment notwithstanding the verdict because the plaintiff had failed to provide legally sufficient evidence that would justify submitting the case to the jury.[1] The panel also held that Mr. Fieger’s repeated misconduct by itself would have warranted a new trial. In particular, the Court of Appeals indicated that Mr. Fieger (1) without any basis in fact, accused defendants and their witnesses of engaging in a conspiracy, collusion, and perjury to cover up malpractice, (2) asserted without any basis in fact that defense witnesses had destroyed, altered, or suppressed evidence, and (3) insinuated without any basis in fact that one of the defendants had abandoned the plaintiffs medical care to engage in a sexual tryst with a nurse. The panel described Mr. Fieger’s misconduct as “truly egregious” and “pervasive” and concluded that it “completely tainted the proceedings.” Id. at 289, 290.
Three days later, on August 23,1999, Mr. Fieger, in a tone similar to that which he had exhibited during the Badalamenti trial and on his then-daily radio program in Southeast Michigan, continued by addressing the three appellate judges in that case in the following manner, “Hey Michael Talbot, and Bandstra, and Mar-key, I declare war on you. You declare it on me, I declare it on you. Kiss my ass, too.” Mr. Fieger, referring to his client, then said, “He lost both his hands and both his legs, but according to the Court of Appeals, he lost a finger. Well, the finger he should keep is the one where he should shove it up their asses.”
Two days later, on the same radio show, Mr. Fieger called these same judges “three jackass Court of Ap *237 peals judges.” When another person involved in the broadcast used the word “innuendo,” Mr. Fieger stated, “I know the only thing that’s in their endo should be a large, you know, plunger about the size of, you know, my fist.” Finally, Mr. Fieger said, “They say under their name, ‘Court of Appeals Judge,’ so anybody that votes for them, they’ve changed their name from, you know, Adolf Hitler and Goebbels, and I think — what was Hitler’s — Eva Braun, I think it was, is now Judge Markey, she’s on the Court of Appeals.”[2]
Subsequently, Mr. Fieger filed a motion for reconsideration before the same panel. After that motion was denied, this Court denied Mr. Fieger’s application for leave to appeal on March 21, 2003.[3]
On April 16, 2001, the Attorney Grievance Commission (AGC), through its Grievance Administrator, filed a formal complaint with the ADB, alleging that Mr. Fieger’s comments on August 23 and 25, 1999, were in violation of several provisions of the Michigan Rules of Professional Conduct, including MRPC 3.5(c), MRPC 6.5(a), and MRPC 8.4(a) and (c).[4] While the complaint was pending, the parties entered into a stipulation. In *238 return for Mr. Fieger’s agreement not to contest that his remarks had violated MRPC 3.5(c) and MRPC 6.5(a), the charges alleging a violation of MRPC 8.4(a) and (c) would be dismissed. The parties further stipulated the sanction of a reprimand. The agreement was specifically conditioned on Mr. Fieger’s being allowed to argue on appeal, while the discipline was stayed, both the applicability and the constitutionality of MRPC 3.5(c) and MRPC 6.5(a). Mr. Fieger maintained that the rules were inapplicable because his remarks were made after the case was completed and were not made in a courtroom. Further, he maintained that the two rules were unconstitutional because they infringed his First Amendment rights.[5]
On appeal to the ADB, with one member recused, the remaining eight members of the ADB issued three opinions. The lead opinion, signed by board members Theodore J. St. Antoine, William P Hampton, and George H. Lennon, concluded that MRPC 3.5(c) and MRPC 6.5(a) did not apply to Mr. Fieger’s comments because they were made outside the courtroom in a case they regarded as completed. They further observed that, if the rules did apply, then they were in violation of the First Amendment. A second opinion, signed by members Lori McAllister and Billy Ben Baumann, agreed that Mr. Fieger’s comments were protected by the First Amendment, but dissented from the lead opinion’s conclusion that the rules only apply to remarks made within the courtroom. A third opinion, *239 agreeing in part with the second opinion, and signed by members Marie E. Martell, Ronald L. Steffens, and Ira Combs, Jr., held that Mr. Fieger’s remarks, even though made outside the courtroom, were prohibited by the rules, and that the remarks were not protected by the First Amendment.
The sum of all this was that a majority (albeit not the same majority for each issue) concluded that the two rules applied to Mr. Fieger’s out-of-court statements, while a different majority concluded that those rules were in violation of the First Amendment.[6]
The AGC, through its Grievance Administrator, sought leave to appeal in this Court. We granted leave to appeal to consider whether the remarks by Mr. Fieger, although uncontestedly discourteous, undignified, and disrespectful, nevertheless did not warrant professional discipline because they were made outside the courtroom and after the Court of Appeals had issued its opinion. We also granted leave to appeal to consider whether the ADB possesses the authority to decide issues of constitutionality and whether the two rules in question are constitutional.[7]
*240 II. STANDARDS OF REVIEW
We typically review the ADB’s factual conclusion that an attorney has violated a rule of professional conduct for proper evidentiary support on the whole record. In re Freedman, 406 Mich 256; 277 NW2d 635 (1979); In re Grimes, 414 Mich 483; 326 NW2d 380 (1982). Yet, review of the record for evidentiary support of the factual conclusions is unnecessary here because Mr. Fieger’s plea agreement did not contest that the remarks were “undignified, discourteous, and disrespectful.” The remaining issues to be resolved are questions of law. We decide de novo the legal issues concerning the ADB’s authority, construction of the rules of professional conduct, and the constitutionality of these rules. Grievance Administrator v Underwood, 462 Mich 188, 193-194; 612 NW2d 116 (2000).
III. ATTORNEY LICENSURE AND DISCIPLINE IN MICHIGAN
Const 1963, art 6, § 5[8] and MCL 600.904[9] give this Court the duty and responsibility to regulate and discipline the members of the bar of this state. Grievance Administrator v Lopatin, 462 Mich 235, 241; 612 NW2d 120 (2000). Most obviously, this responsibility entails concern for the competence, character, and fitness of *241 attorneys, but historically also has included the issuance of rules regulating the manner in which lawyers communicate to the public about other participants in the legal system, primarily judges and other lawyers. While many other professions are regulated with the goal of ensuring competence and fitness, it is only the legal profession that also has imposed upon its members regulations concerning the nature of public comment. The First Amendment implications are easily understood in such a regulatory regime and this Court, like other courts of last resort including the United States Supreme Court, has attempted to appropriately draw the line between robust comment that is protected by the First Amendment and comment that undermines the integrity of the legal system.
Indeed, whether this line can be drawn anywhere to take cognizance of the interests of the legal system is the central issue in this case. The proposition asserted by Mr. Fieger is that, under the First Amendment of the United States Constitution, there can be no courtesy or civility rules at all of this sort and that judges and other lawyers assailed verbally, as public figures, have the same remedies any other public figures have in libel and slander law.[10] As the opinions of the ADB suggest, the absolutism of this argument is not without some allure.[11] Yet, respect for the wisdom of those who have preceded us in the judiciary in this country and the traditions of the legal process counsel that narrow and *242 carefully tailored regulations of the sort set forth in MRPC 3.5(c) and MRPC 6.5(a) are necessary adjuncts to a responsible legal system and are compatible with the First Amendment. It is first necessary to outline why such regulations are necessary at all. That is, what substantial interests are these courtesy and civility rules designed to further? In particular, are there some interests that such rules further beyond merely protecting judges from the robust criticism that is sometimes a part of the give-and-take of the democratic process? Do such rules merely insulate judges from the inconvenience of being held accountable from their public actions? In establishing rules designed to deter and sanction uncivil and discourteous conduct on the part of lawyers, we believe that this Court is doing far more than protecting the sensitivities of judges; rather, we believe that we are upholding the integrity of that which is being carried out by the judicial branch of government.
The performance of these responsibilities requires a process in which the public can have the highest sense of confidence, one in which the fairness and integrity of the process is not routinely called into question, one in which the ability of judges to mete out evenhanded decisions is not undermined by the fear of vulgar characterizations of their actions, one in which the public is not misled by name-calling and vulgarities from lawyers who are held to have special knowledge of the courts, one in which discourse is grounded in the traditional tools of the law — language, precedents, logic, and rational analysis and debate. To disregard such interests in the pursuit of a conception of the First Amendment that has never been a part of our actual Constitution would in a real and practical sense adversely affect our rule of law, a no less indispensable foundation of our constitutional system than the First Amendment.
*243 These interests in a responsible legal process heretofore have been unquestioned and have been thought to justify a lawyer discipline system in this state that encompasses rules on courtesy and civility toward others. Accordingly, in cases such as Attorney General v Nelson, 263 Mich 686, 701; 249 NW 439 (1933), and more recently in In re Chmura, 461 Mich 517, 535; 608 NW2d 31 (2000) (Chmura I), we have recognized that in order to preserve the integrity of our legal process, it is of utmost importance that the people have confidence in this process. We have recognized that rules of the sort at issue here have as their purpose considerably more than protecting the sensitivities of judges, but are designed to maintain public respect for a rule of law that is dependent on such public respect. In Ginger v Wayne Circuit Judge, 366 Mich 675, 679; 116 NW2d 216 (1962), we indicated that a lawyer’s duty to maintain a respectful attitude toward the courts is “ ‘not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance.’ ” (Citation omitted.) In furtherance of this, the law has reposed special stewardship duties on lawyers on the basis of the venerable notion that lawyers are more than merely advocates who happen to carry out their duties in a courtroom environment, they are also officers of the court. In this exclusive role, lawyers have special responsibilities in their relations with other officers of the court.[12]
*244 In discussing the scope of this obligation in the 19th century, the United States Supreme Court stated that attorneys are under an implied “obligation ... to maintain at all times the respect due to courts of justice and judicial officers. This obligation ... includes abstaining out of court from all insulting language and offensive conduct toward the judges personally for their judicial acts.” Bradley v Fisher, 80 US (13 Wall) 335, 355; 20 L Ed 646 (1872).
More recently, the United States Supreme Court elaborated on this unique status:
As an officer of the court, a member of the bar enjoys singular powers that others do not possess; by virtue of admission, members of the bar share a kind of monopoly granted only to lawyers. Admission creates a license not only to advise and counsel clients but also to appear in court and try cases; as an officer of the court, a lawyer can cause persons to drop their private affairs and be called as witnesses in court, and for depositions and other pretrial processes that, while subject to the ultimate control of the court, may be conducted outside courtrooms. The license granted by the court requires members of the bar to conduct themselves in a manner compatible with the role of courts in the administration of justice. [In re Snyder, 472 US 634, 644-645; 105 S Ct 2874; 86 L Ed 2d 504 (1985).]
Michigan has statutorily recognized this status in MCL 600.901, which provides:
The members of the state bar of Michigan are officers of the courts of this state, and have the exclusive right to designate themselves as “attorneys and counselors,” or *245 “attorneys at law,” or “lawyers.” No person is authorized to practice law in this state unless he complies with the requirements of the supreme court with regard thereto.
It is to this end that our bar entrance requirements look to character as well as competence, and the bar admissions process culminates in a way unprecedented in other professions with the taking of an oath pursuant to MCL 600.913. This oath provides that the lawyer will, upon being accorded the privileges provided by membership in the bar,[13] (1) maintain the respect due to courts of justice and judicial officers, (2) abstain from all offensive personality, and (3) conduct himself or herself personally and professionally in conformity with the high standards of conduct imposed on members of the bar as conditions for the privilege to practice law in Michigan. State Bar Rule 15, § 3(1).
Moreover, MCR 9.103(A) provides:
The license to practice law in Michigan is, among other things, a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters and to aid in the administration of justice as an attorney and counselor and as an officer of the court. It is the duty of every attorney to conduct himself or herself at all times in conformity with standards imposed on members of the bar as a condition of the privilege to practice law. These standards include, hut are not limited to, the rules of professional responsibility and the rules of judicial conduct that are adopted by the Supreme Court.
As contemplated by this rule, this Court has promulgated the Michigan Rules of Professional Conduct. Of *246 immediate interest is MRPC 3.5(c), which does not preclude criticism by a member of the legal profession, of even the most robust character, but precludes only “undignified or discourteous conduct toward the tribunal.” The comment on MRPC 3.5 elaborates:
The advocate’s function is to present evidence and argument so that the cause may be decided according to law. Refraining from undignified or discourteous conduct is a corollary of the advocate’s right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge, but should avoid reciprocation; the judge’s default is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review, and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics.
Similarly, MRPC 6.5(a) provides only that “[a] lawyer shall treat with courtesy and respect all persons involved in the legal process.” The comment on MRPC 6.5 explains:
A lawyer is an officer of the court, who has sworn to uphold the federal and state constitutions, to proceed only by means that sue truthful and honorable, and to avoid offensive personality. It follows that such a professional must treat clients and third persons with courtesy and respect. For many citizens, contact with a lawyer is the first or only contact with the legal system. Respect for law and for legal institutions is diminished whenever a lawyer neglects the obligation to treat persons properly. It is increased when the obligation is met.
As should be clear, these rules are designed to prohibit only “undignified,” “discourteous,” and “disrespectful” conduct or remarks. The rules are a call to discretion and civility, not to silence or censorship, and they do not even purport to prohibit criticism. The wisdom of such rules was recognized by United Stated *247 Supreme Court Justice Potter Stewart in his concurring opinion in In re Sawyer, 360 US 622, 646; 79 S Ct 1376; 3 L Ed 2d 1473 (1959), in which he remarked, “A lawyer belongs to a profession with inherited standards of propriety and honor, which experience has shown necessary in a calling dedicated to the accomplishment of justice. He who would follow that calling must conform to those standards.”
Equally pertinent is the Preamble to our Rules of Professional Conduct, “A lawyer should demonstrate respect for the legal system and for those that serve it, including judges, other lawyers and public officials. While it is a lawyer’s duty, when necessary, to challenge the rectitude of official action, it is also the lawyer’s duty to uphold legal process.”
It is in this historical and professional context that Mr. Fieger’s remarks must be reviewed.
IV ANALYSIS of the applicability of THE RULES
A. WERE MR. FIEGER’S REMARKS MADE AFTER THE CONCLUSION OF THE CASE?
Mr. Fieger asserts that the remarks in controversy were made after the Badalamenti case was concluded. This matter is consequential because greater restraint, if indeed any is constitutionally allowed, is permissible when a case is ongoing than when it is completed. As the United States Supreme Court said in Gentile, supra at 1070, “ ‘When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied.’ ” (Citation omitted.) Accordingly, “the speech of lawyers representing clients in pending cases may be regulated under a less *248 demanding standard than that established for regulation of the press . ...” Id. at 1074.
The obvious question here is whether the Badalamenti case was actually “pending” at the time of Mr. Fieger’s comments. In answering this question, we are guided both by the Michigan Court Rules and by the ordinary definition of “pending.” MCR 7.215(F)(1)(a)[14] states that a Court of Appeals decision generally does not become effective until “after the expiration of the time for filing an application for leave to appeal to the Supreme Court, or, if such an application is filed, after the disposition of the case by the Supreme Court.” Thus, at a minimum, a decision in the Court of Appeals is still “pending” until the expiration of the period for filing an application for leave to appeal that decision in this Court.[15] At *249 all times pertinent,[16] the period for filing such an application was 21 days from the date of the mailing or filing appealed from, or if a timely motion for rehearing was filed in the Court of Appeals, 21 days from the mailing of an order denying the motion. MCR 7.302(C)(2)(c). Moreover, Black’s Law Dictionary (6th ed), defines “pending” as follows:
Begun, but not yet completed; during; before the conclusion of; prior to the completion of; unsettled; undetermined; in process of settlement or adjustment. Awaiting an occurrence or conclusion of action, period of continuance or indeterminancy. Thus, an action or suit is “pending” from its inception until the rendition of final judgment.
Mr. Fieger made his remarks on August 23 and 25, 1999, three days and five days, respectively, after the Court of Appeals issued its decision, when the time for filing either for rehearing in the Court of Appeals or an application for leave to appeal in this Court had not yet expired. Indeed, Mr. Fieger ultimately did file a timely motion for rehearing in the Court of Appeals on September 10,1999.
Because the Court of Appeals decision had not yet become effective as of the date of Mr. Fieger’s comments, and because the Court of Appeals, by granting a motion for reconsideration or rehearing, could still have affected the substantial rights of his client, we conclude that the Badalamenti case was “begun, but not yet completed” and that Mr. Fieger’s comments were made “during,” “before the conclusion of,” and “prior to the completion of” that case. Moreover, the case was “awaiting an occurrence or conclusion of action”— namely, the running of the aforementioned periods for *250 filing. During this interim, then, the case was in a “period of continuance or indeterminancy.”
Thus, the Badalementi case was clearly still pending when Mr. Fieger made his remarks.[17]
B. DO THE RULES ONLY APPLY TO COMMENTS MADE IN A COURTROOM?
Mr. Fieger next asserts that MRPC 3.5(c) and MRPC 6.5(a) only apply to comments within a courtroom or its immediate environs. We disagree.
MRPC 3.5(c) provides that a lawyer shall not “engage in undignified or discourteous conduct toward the tribunal.” (Emphasis added.) We note that the rule does not provide a definition of the word “toward.” It is well established that if a term in a court rule is not defined, we interpret the term in accordance with its everyday, plain meaning. See, e.g., People v Petit, 466 Mich 624, 627; 648 NW2d 193 (2002). Random House Webster’s *251 College Dictionary (1997) lists several definitions of the preposition “toward,” including “in the direction of” and “with respect to; as regards.”
In light of this definition, we disagree with Mr. Fieger’s argument that the rule is inapplicable to his statements because those statements were directed toward an audience and outside a courtroom, and, therefore, not toward a tribunal. Mr. Fieger made remarks about (a) the three judges (b) who comprised the panel (c) that ruled against his client (d) with regard to the content and value of that judgment, (e) which remarks aired on a public broadcast. Even though made outside a courtroom, Mr. Fieger’s statements attacked the judges in their capacity as judges and in a forum designed to reach both the public and these judges (who were included among the members of the community who could receive this broadcast). Because such comments were “in the direction of” and “with respect to” these judges, they were necessarily comments made “toward the tribunal.”
There is nothing in this phrase “toward the tribunal” that limits the applicability of the rule only to remarks made in a courtroom.[18] Mr. Fieger’s construction of the rule would effectively insert the requirement that the *252 conduct “actually disrupt the proceeding.” Yet this language, which is in the American Bar Association version of this rule, is absent from our rule. Further, if MRPC 3.5(c) applies only when an attorney is in a courtroom, the rule would be largely superfluous, and of little practical utility, given that a court’s contempt power, enforceable by fíne or incarceration pursuant to MCL 600.1711(1), is always available to restore or maintain order when the offending conduct or remarks occur before the judge in the courtroom.
The construction of the rule asserted by Mr. Fieger fails to accord consideration to the importance the courtesy and civility rules serve as a vehicle for preserving the public’s confidence in the integrity of the legal process. Most significantly, however, it is a construction that is not in accord with the actual language of the rule. Thus, we agree with the conclusion of the majority of the ADB that MRPC 3.5(c) applies to Mr. Fieger’s remarks.
MRPC 6.5(a) provides that “[a] lawyer shall treat with courtesy and respect all persons involved in the legal process.” Mr. Fieger argues that somehow this rule does not apply to a lawyer’s use of abusive language directed toward judges in the context of a radio program. Again, we disagree. MRPC 6.5(a) applies in this instance because, as the previous discussion makes obvious, the Court of Appeals judges were “persons involved in an ongoing legal process.”[19]
Therefore, we conclude that the comments made by Mr. Fieger are in violation of both MRPC 3.5(c) and MRPC 6.5(a).
*253 V CAN THE ADB DECLARE A RULE UNCONSTITUTIONAL?
The AGC, through its Grievance Administrator, asserts that the ADB has no authority to declare unconstitutional a rule of professional conduct. We agree.
A disciplinary proceeding in Michigan commences upon the filing of a formal complaint and is heard before a panel of three lawyers. Appeals are then taken to the ADB. The ADB is an administrative body, comprised of nine individuals appointed by this Court, three of whom are not attorneys.[20] While the ADB, like all other governmental entities, must operate in accord with the Constitution, for example, on questions such as compelled witness self-incrimination,[21] it does not possess the power to hold unconstitutional rules of professional conduct that have been enacted by this Court. As we said in Wikman v Novi, 413 Mich 617, 646-647; 322 NW2d 103 (1982), administrative agencies generally do not possess the power to declare statutes unconstitutional because this is a core element of the “judicial power” and does not belong to an agency that is not exercising this constitutional power. The power of judicial review is one that belongs exclusively to the judicial branch of our government. Lewis v Michigan, 464 Mich 781, 788-789; 629 NW2d 868 (2001). Const 1963, art 3, § 2. See, also, Richardson v Secretary of State, 381 Mich 304, 309; 160 NW2d 883 (1968).[22]
*254 Should any attorney appearing before the ADB believe a rule itself to be unconstitutional, such as in this case, resort must be made to an appeal to this Court, and, if we concur in this assessment, it is our responsibility to declare such rule unconstitutional. See MCR 9.122(A)(1) and Fieger v Thomas, 74 F3d 740, 747 (CA 6, 1996).[23]
VI. ARE MRPC 3.5(c) AND MRPC 6.5(a) UNCONSTITUTIONALLY VAGUE?
Mr. Fieger next argues that whatever the other constitutional shortcomings of MRPC 3.5(c) and MRPC 6.5(a), they are unconstitutionally vague because a lawyer cannot know ahead of time which of his or her remarks might run afoul of the rules. Such a challenge cannot be successfully advanced here because there is no question that even the most casual reading of these rules would put a person clearly on notice that the kind of language used by Mr. Fieger would violate MRPC 3.5(c) and MRPC 6.5(a). To invite the sodomization of a judge, with a client’s finger, a plunger, or his own fist, and to invite a judge to kiss one’s ass are statements that do not come close to the margins of the “civility” or “courtesy” rules.[24] While MRPC 3.5(c) and MRPC 6.5(a) *255 are undoubtedly flexible, and the AGC will exercise some discretion in determining whether to charge an attorney with violating them, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity. Ward v Rock Against Racism, 491 US 781, 794; 109 S Ct 2746; 105 L Ed 2d 661 (1989). A statute or rule is not required to define an offense with “mathematical certainty.” Grayned v City of Rockford, 408 US 104, 110; 92 S Ct 2294; 33 L Ed 2d 222 (1972). Because statutes and rules are presumptively valid, they “ ‘are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.’ ” Parker v Levy, 417 US 733, 757; 94 S Ct 2547; 41 L Ed 2d 439 (1974) (citation omitted).
If “civility” and “courtesy” rules can ever satisfy constitutional muster, as we believe they can, it is beyond peradventure that the comments at issue in this case clearly violated such rules.
Mr. Fieger also argues that his remarks are political speech and thus fit within the protection afforded campaign speech in In re Chmura (After Remand), 464 Mich 58, 72-73; 626 NW2d 876 (2001) (Chmura II). In Chmura II we considered the propriety of a variety of remarks made by an incumbent judge during a reelection campaign that had served as the basis for sanction by the Judicial Tenure Commission of our state. We concluded in light of the First Amendment that the *256 judge’s statements were all constitutionally protected.[25] But, the Chmura II political context is entirely missing here. There was no political campaign underway nor was Mr. Fieger attempting by his comments to participate in such a campaign.[26] Thus, Chmura II offers no safe harbor for Mr. Fieger. See, also, In re Palmisano, 70 F3d 483,487 (CA 7,1995) (courts may require attorneys to speak with greater care and civility than is the norm in political campaigns).
Not only was Mr. Fieger’s speech not campaign speech, it was not political speech of any kind. In discussing political speech, the United States Supreme Court has stated:
“The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.” [Thornhill v Alabama, 310 US 88, 101-102; 60 S Ct 736; 84 L Ed 1093 (1940).] The First Amendment “was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.” Roth v United States, 354 U. S. 476, 484 [77 S Ct 1304; 1 L Ed 2d 1498] (1957). [Meyer v Grant, 486 US 414, 421; 108 S Ct 1886; 100 L Ed 2d 425 (1988).]
To invite the sodomization of a judge, with a client’s finger, a plunger, or one’s own fist, and to invite a judge to kiss one’s ass can hardly be considered an “interchange of ideas for the bringing about of political and social changes.” “Resort to epithets or personal abuse is not in any proper sense communication of information *257 or opinion safeguarded by the Constitution... Cantwell v Connecticut, 310 US 296, 309-310; 60 S Ct 900; 84 L Ed 1213 (1940).[27]
Mr. Fieger further urges that his remarks should receive the same broad protection the First Amendment was found to provide in New York Times Co v Sullivan, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964). We disagree because this is an attorney discipline matter and more restrictive rules are permissible in such a circumstance. In Sullivan, the United States Supreme Court created a high standard of proof for a public official seeking civil damages for defamation. Damages can only be recovered if the public figure can prove by clear and convincing evidence that the offending statements were made with knowledge that they were false or with reckless disregard of their falsity. Yet here, we deal with a matter of professional discipline. There is no *258 civil action, and, thus, Sullivan is inapplicable.[28] Nor are the interests that prompted Sullivan at all in evidence here. Whereas Sullivan was designed to further robust public discussion in the press, and to avoid the chilling effects on the media of defamation or libel lawsuits predicated upon mere mistakes or inaccuracies in reporting, neither of these constitutional concerns is implicated by court rules allowing the sanctioning an attorney for crude or vulgar language directed against a judge in a pending proceeding.
Further, that the First Amendment is not offended by Michigan’s disciplinary rules is suggested by Gentile v State Bar of Nevada, supra at 1071, where the United States Supreme Court stated:
It is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to “free speech” an attorney has is extremely circumscribed. An attorney may not, by speech or other conduct, resist a ruling of the trial court beyond the point necessary to preserve a claim for appeal. Even outside the courtroom, a majority of the Court in two separate opinions in the case of In re Sawyer, 360 U.S. 622, 3 L. Ed. 2d 79, S. Ct. 1376 (1959), observed that lawyers in pending cases were subject to ethical restrictions on speech to which an ordinary citizen would not be. [Citations omitted; emphasis added.]
Gentile, supra at 1073, also held that in analyzing whether an ethics rule violates a lawyer’s First Amendment rights, the court must engage “in a balancing process, weighing the State’s interest in the regulation of a specialized profession against a lawyer’s First Amendment interest in the kind of speech that was at *259 issue.” These state interests include promoting the respect of the courts by the citizenry and maintaining the integrity of the judicial process so as to enhance compliance with adjudications. Further, in a system with hundreds of judges, each of whom is subject to popular election, the state also has an interest in limiting attorney comment that takes the form of personal attacks on judges, because a system in which intimidating attacks are permitted fosters the risk of eventually realizing the intended effect of such attacks: a potentially cowed judiciary.
In Sawyer, the United States Supreme Court considered an order affirming the suspension of an attorney from practice because of her attack on the fairness and impartiality of a judge. The plurality opinion, which found the discipline to be improper, concluded that the comments had not in fact impugned the judge’s integrity. But Justice Stewart, who provided the fifth vote for reversal of the sanction, observed in his concurring opinion that he could not join any possible “intimation that a lawyer can invoke the constitutional right of free speech to immunize himself from even-handed discipline for proven unethical conduct....” Sawyer, supra at 646. He concluded that “[o]bedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech.” Id. at 646-647.
As observed, pursuant to Gentile, supra at 1073, to assess the constitutionality of a rule of lawyer discipline, a court must weigh the state’s interests in support of the rule against an attorney’s First Amendment interests in the kind of speech at issue. In this case, we must balance Mr. Fieger’s right to criticize judges as he did, using foul and vulgar language, against the state’s interest in the maintenance of a system of lawyer discipline that imposes some measure of limitation on such language.
*260 Before undertaking this balancing process, it may be appropriate to consider this Court’s demonstrated solicitude for lawyer speech, and in particular this lawyer’s freedom of speech, by reviewing how we struck the balance with Mr. Fieger in an earlier professional disciplinary matter. In Grievance Administrator v Fieger, 469 Mich 1241 (2003), we declined to review a dismissal by the ADB of an AGC claim that Mr. Fieger had violated MRPC 8.2(a) when he accused a county prosecutor of covering up a murder because the ADB arguably had considered Mr. Fieger’s accusations to constitute a comment or opinion on the office holder’s performance of his duties. As a result, Mr. Fieger was found not to be subject to sanction for his statement. Although Mr. Fieger’s comment was an irresponsible and baseless comment, and altogether unfair to the prosecutor,[29] this Court gave every benefit of the doubt to Mr. Fieger in its interpretation of what he had meant to communicate by his statement. However, there can be no similar benefit to any doubt in the current case in which Mr. Fieger has uttered the crudest and most vulgar statements concerning judges in a pending lawsuit. As the United States Supreme Court stated in Chaplinsky v New Hampshire, 315 US 568, 572; 62 S Ct 766; 86 L Ed 1031 (1942), quoting Cantwell v Connecticut, supra at 309-310, “ ‘Resort to epithets or personal *261 abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution ____’ ”
There is no reasonable construction of Mr. Fieger’s remarks that could lead to the conclusion that these were mere comment on the professional performance of these three judges of the Court of Appeals. To call a judge a “jackass,” a “Hitler,” a “Goebbels,” a “Braun” and to suggest that a lawyer is “declaring] war” on them and that the judge should “[k]iss [the lawyer’s] ass,” or should be anally molested by finger, fist, or plunger, is, to say the least, not to communicate information; rather, it is nothing more than personal abuse. We conclude that such coarseness in the context of an officer of the court participating in a legal proceeding warrants no First Amendment protection when balanced against this state’s compelling interest in maintaining public respect for the integrity of the legal process. United States v O’Brien, 391 US 367, 377; 88 S Ct 1673; 20 L Ed 2d 672 (1968).
MRPC 3.5(c) and MRPC 6.5(a) did not preclude Mr. Fieger from expressing disagreement with the judges in his case, and they did not preclude criticism, even strong criticism, from being directed toward these judges; rather, they only precluded him from casting such disagreement and criticism in terms that could only bring disrepute on the legal system. The limited restriction placed by the rules on Mr. Fieger’s speech is narrowly drawn and is no greater than is necessary to maintain this state’s longstanding and legitimate interests in the integrity of its legal system. Chmura I, supra.
As the United States Supreme Court stated in In re Snyder, supra at 647:
*262 All persons involved in the judicial process — judges, litigants, witnesses, and court officers — owe a duty of courtesy to all other participants. The necessity for civility in the inherently contentious setting of the adversary process suggests that members of the bar cast criticisms of the system in a professional and civil tone.
It is also the case that our civility and courtesy rules serve to vindicate this Court’s interest in the good moral character of the lawyers it has licensed to serve as officers of the court.[30] Implicit in being an officer of the court is the recognition that “ ‘obedience to ethical precepts may require abstention from what in other circumstances might be constitutionally protected speech.’ ” Gentile, supra at 1071 (citation omitted).[31]
Mr. Fieger’s comments then are not protected under his various theories of vagueness, of political speech, or of public-figure comment. It is important, however, to reiterate that we are not now, nor have we ever in the *263 past, suggested that judges are beyond criticism.[32] As we stated in Attorney General v Nelson, supra at 701:
An attorney owes devotion to the interests of his clients. He should be zealous in the maintenance and defense of their rights, and should be in no way restrained in the discharge of such duty by fear of judicial disfavor. But at the same time he should be at all times imbued with the respect which he owes to the court before whom he is practicing. It is of the utmost importance to the preservation of our system of government that our people have confidence in the integrity of our courts.
The point is that lawyers have an unquestioned right to criticize the acts of courts and judges. In re Estes, 355 Mich 411, 414; 94 NW2d 916 (1959). Moreover, there is no prohibition on a lawyer engaging in such criticism even during the pendency of a case. There are limitations only on the form and manner of such criticism, limitations that serve compelling interests within our constitutional and legal systems.[33]
Because Mr. Fieger does not contest that MRPC 3.5(c) and MRPC 6.5(a) were in fact violated if the questions he has raised on appeal are decided unfavorably to him, given our answers to these questions, he must now be viewed as having violated both rules.
We close by quoting the following remarks of the Ohio Supreme Court nearly a century ago when faced with the same duty to deal with a misbehaving lawyer as we are today:
*264 When a man enters upon a campaign of vilification he takes his fate into his own hands and must expect to be held to answer for the abuse of the privilege extended to him by the constitution. An attorney of more than twenty years’ standing at the bar must be presumed to know the difference between respectful, fair and candid criticism, and scandalous abuse of the courts which gave him the high privilege, not as a matter of right, to be a priest at the altar of justice. [In re Thatcher, 80 Ohio St 492, 669; 89 NE 39 (1909).]
It is for all these reasons that we conclude that Mr. Fieger’s vulgar and crude attacks on three members of our Court of Appeals were not constitutionally protected and that he is subject to professional discipline for having made them.
VII. RESPONSE TO JUSTICE KELLY’S AND JUSTICE CAVANAGH’S DISSENTS
In their repudiation of “courtesy” and “civility” rules, the dissents would usher an entirely new legal culture into this state, a Hobbesian legal culture, the repulsiveness of which is only dimly limned by the offensive conduct that we see in this case. It is a legal culture in which, in a state such as Michigan with judicial elections, there would be a permanent political campaign for the bench, pitting lawyers against the judges of whom they disapprove. It is a legal culture in which rational and logical discourse would come increasingly to be replaced by epithets and coarse behavior, in which a profession that is already marked by declining standards of behavior would be subject to further erosion, and in which public regard for the system of law would inevitably be diminished over time.[34]
*265 By allowing a lawyer to say anything short of libel under New York Times v Sullivan, the position of the dissents would also necessarily and inevitably require that judges — persons who are periodically subject to popular reelection under our Constitution — be allowed to engage in the same kind of “free speech” to which attorneys are entitled — if only for the purposes of electoral self-defense.[35] Further, such a required loosening of the canons of judicial conduct would also likely have other lamentable effects that could quickly jeopardize even the freedom of speech lawyers currently enjoy. It is hard to imagine the lawyer who would want to test the proposition of how much effect a judge’s retaliatory comment adverting to the lawyer’s lack of competence, character, or the like would have on the lawyer’s practice. Thus, the newly given lawyer right of speech the dissents would recognize would perversely conduce to a situation where lawyers would be silenced. While surely all would hope judges would not use this *266 new opportunity to intimidate the bar, the history of how authority is eventually used by those empowered is not encouraging. The dissents accord virtually no consideration to these ramifications of their position. To the majority, however, such consequences are of grave concern.
VIII. CONCLUSION
For the reasons set forth in this opinion, we reverse the opinion and order of the ADB and remand to the ADB for entry of the agreed-to order of reprimand.
Corrigan, Young, and Markman, concurred with Taylor, C.J.

 Badalamenti v William Beaumont Hosp-Troy, 237 Mich App 278, 289; 602 NW2d 854 (1999).

 The three appellate judges did not respond to Mr. Fieger during this period. Code of Judicial Conduct Canon 3(A)(6) states that ajudge should abstain from public comments about a pending or impending proceeding in any court. The rationale for this rule is, as we stated in In re Hocking, 451 Mich 1, 18; 546 NW2d 234 (1996), the avoidance of a media war of words that may erode public confidence in the judiciary.

 Badalamenti v William. Beaumont Hosp-Troy, 463 Mich 980 (2001).

 The ADB is this Court’s adjudicative arm for discharging our responsibility to supervise and discipline Michigan attorneys. MCR 9.110(A). MRPC 3.5(c) provides that a lawyer shall not “engage in undignified or discourteous conduct toward the tribunal.” MRPC 6.5(a) provides that “[a] lawyer shall treat with courtesy and respect all persons involved in the legal process.” MRPC 8.4(a) provides that it is professional misconduct for a lawyer to “violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so *238 through the acts of another!.]” MRPC 8.4(c) provides that it is professional misconduct for a lawyer to “engage in conduct that is prejudicial to the administration of justice!.]”

 The First Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, provides that the government “shall make no law. . . abridging the freedom of speech ....” US Const, Am I.

 We disagree with Justice Cavanagh’s claim that the ADB did not find the rule unconstitutional. Reading all three opinions issued by the ADB shows that one majority found the rules applied to Mr. Fieger’s conduct, but a different majority found that the Constitution forbids sanctioning Mr. Fieger for violating the rules. This is tantamount to declaring the rules unconstitutional.

 472 Mich 1244 (2005). Mr. Fieger then filed a notice of removal on June 8, 2005, removing the case to federal court. Because Mr. Fieger could not “meet his burden to show removal is proper,” the federal district judge granted the Grievance Administrator’s motion to remand the case hack to this Court on October 19, 2005. Grievance Administrator v Fieger, 409 F Supp 2d 858, 865 (ED Mich, 2005). Mr. Fieger appealed to the Sixth Circuit Court of Appeals. On March 10, 2006, the Sixth Circuit summarily affirmed the district court, concluding that “there is no conceivable basis to support removal of the action” under 28 USC 1443(1). Unpublished order, entered March 10, 2006 (Docket No. 05-2572).

 Const 1963, art 6, § 5 provides that “[t]he supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state.”

 MCL 600.904 provides:
The Supreme Court has the power to provide for the organization, government, and membership of the state bar of Michigan, and to adopt rules and regulations concerning the conduct and activities of the state bar of Michigan and its members, the schedule of membership dues therein, the discipline, suspension, and disbarment of its members for misconduct, and the investigation and examination of applicants for admission to the bar.

 Mr. Fieger does not address the rule restraining judicial speech regarding a pending case. Code of Judicial Conduct, Canon 3(A)(6). See footnote 2 of this opinion.

 For a discussion of the “absolutist” view of the First Amendment and its problems see Stanford Law Professor John Hart Ely’s Democracy and Distrust; a Theory of Judicial Review (Cambridge, Mass: Harvard University Press, 1980), pp 109-112.

 See, e.g., Ex parte Garland, 71 US (4 Wall) 333, 378; 18 L Ed 366 (1867) (describing attorneys as “officers of the court,” to whom the court awards that status upon a showing of their “legal learning and fair private character”), and Goldfarb v Virginia State Bar, 421 US 773, 792; 95 S Ct 2004; 44 L Ed 2d 572 (1975) (noting the historical treatment of lawyers as officers of the courts).
That a lawyer’s role as an officer of the court is distinct and has heen recognized as such can be seen, for example, in the frequent discussions *244 of the standards of ethical behavior in the regular columns of the President of the Michigan State Bar in the Michigan Bar Journal. As merely one illustration of this recognition, in the March 2006 edition, the current President, Thomas W Cranmer, asserts that “[l]awyers operate under strict ethical rules, and the rules are enforced” and “[o]ur disciplinary system is rigorous and active.” Cranmer, Defending Lawyers, 66 Mich B J 14 (March, 2006).

 The fact that membership in the bar is a privilege subject to conditions was reiterated in Gentile v State Bar of Nevada, 501 US 1030, 1066; 111 S Ct 2720; 115 L Ed 2d 888 (1991), in which the Court stated, “ ‘Membership in the bar is a privilege burdened with conditions,’ to use the oft-repeated statement of Cardozo ....” (Citation omitted.)

 Similarly, under MCR 7.210(H), the Court of Appeals does not treat a case as disposed of (and so does not return the record to a lower court) until the period for application for leave to appeal before our Court expires and no motion for reconsideration or other special request remains pending in the Court of Appeals.
We note that MCR 7.317(C) and (D), rules applicable in this Court, similarly distinguish between entry of an order or opinion and issuance —i.e., the effectiveness — of the same. This distinction further suggests that time may intervene between when an order or opinion enters and when it reaches finality. Indeed, our own appellate court practice is not to remit the record to the lower court until this time has elapsed. See, e.g., Luscombe v Shedd’s Food Products Corp, 212 Mich App 537, 538-541; 539 NW2d 210 (1995) (describing how a trial court did not technically regain jurisdiction over a case until the Court of Appeals remitted the record back to the trial court); see also Black’s Law Dictionary (6th ed) (defining “remittitur of record” as “[t]he returning or sending back by a court of appeal of the record and proceedings in a cause, after its decision thereon, to the court whence the appeal came ...”). Only after the remittitur does our clerk treat a case as disposed of.

 We express no opinion about whether a decision of a lower court is still “pending’ for attorney speech purposes after an appellate court has taken the case on appeal. It is also unnecessary for us to decide, and we do not *249 decide here, the limits our civility rules place on lawyers after a case has been completed.

 MCR 7.302(C) now provides than an application must be filed within 42 days in civil cases, or within 56 days in criminal cases.

 The dissents contend that the Badalamenti case was not “pending” because nothing remained undecided at the time Mr. Fieger made his statements. This position is incorrect and fails to give full meaning to MCR 7.215(F)(1)(a) and MCR 7.302(C)(2)(a) and (b), which make it clear that a Court of Appeals decision does not become effective until after the expiration of the time for filing an application for leave to appeal in this Court. The dissents claim there is a difference between when a case is no longer pending and when it is effective. But, the opposite of “pending” is generally understood as “final” and there is no question that the case was not final when Mr. Fieger made his remarks. Indeed, the fact that Mr. Fieger filed a motion for rehearing in the Court of Appeals after making his comments demonstrates the case was still pending. The Court of Appeals could have changed its mind after considering the motion for rehearing. The fact that Mr. Fieger filed an application for leave to appeal in this Court, after the Court of Appeals denied the motion for rehearing, also demonstrates that the case was still pending, i.e., awaiting rendition of a final judgment. This Court could have taken summary action or action after granting leave to appeal that would have changed the Court of Appeals judgment. Thus, the Badalamenti case was indisputably pending when Mr. Fieger made his remarks.

 The dissents would limit the phrase “toward the tribunal” to comments made in a courtroom. But there is no warrant for such a limitation in the wording of MRCP 3.5(c), which contemplates a broader prohibition. Moreover, Mr. Fieger called the judges by name. Surely this demonstrates that the remarks were made “toward the tribunal.” Notwithstanding Justice Kelly’s assertion that this opinion “necessarily chills comment,” post at 356, it will only “chill,” those comments that are properly “chilled” among members of a profession who are bound to conduct themselves in a courteous and civil manner. In contrast with the dissents, we have no difficulty concluding that the interests of the rule of law, one of the towering achievements of our society, outweigh the interests of an officer of the court in uttering vulgar epithets toward a judge in a pending case.

 Mr. Fieger also asserts that this rule has only been applied in situations involving assaultive, threatening, or obstructive direct behavior. In this regard we point out that in Grievance Administrator v Vos, 466 Mich 1211 (2002), we specifically stated that MRPC 3.5(c) and MRPC 6.5(a) address discourteous behavior and “do not require proof of threatening behavior or statements.”

 See State Bar Grievance Administrator v Estes, 390 Mich 585, 592; 212 NW2d 903 (1973), where this Court held that the power of the ADB’s predecessor was “administrative and quasi-judicial in nature” rather than judicial.

 See MCR 9.113(B)(3).

 The dissents would hold that the ADB, although none of its members is a judge, and although some of its members are not even lawyers, may declare unconstitutional a rule of professional conduct enacted by this Court. We disagree for the reasons already stated. The power of judicial review belongs only to the judicial branch of government and nothing *254 within our Constitution has extended this power to the ADB. Given that only judges can exercise the core judicial power of declaring a statute or rule unconstitutional, there is no basis for the dissents’ assumption that this Court could delegate this power to an agency we have created that is not composed of judges.

 It is also the case that a lawyer may institute an original action in the Michigan Supreme Court to implement the Court’s superintending control over the ADB. MCR 7.304(A). A lawyer may also raise constitutional challenges in a complaint seeking mandamus in this Court. Fieger v Thomas, supra at 747.

 Justice Kelly’s dissent states a concern that our rules of professional conduct might be arbitrarily or discriminatorily enforced by the AGC. Yet, we note that any validly enacted rule, regulation, or statute carries *255 with it the risk of arbitrary or discriminatory enforcement. Such concerns, when they arise, are typically addressed on a case-by-case basis, and Justice Kelly’s dissent offers no reason to believe that alleged violations of MRPC 3.5(c) or MRPC 6.5(a) could not be handled in such a manner. Moreover, neither respondent nor Justice Kelly points to a single case in which an attorney was charged with violating our courtesy or civility rules for inconsequential behavior.

 The later holding of the United States Supreme Court in Republican Party of Minnesota v White, 536 US 765; 122 S Ct 2528; 153 L Ed 2d 694 (2002), is, we believe, harmonious with Chmura II.

 None of the three Court of Appeals judges who were the target of Mr. Fieger’s comments was up for reelection until November 2002 for a six-year term beginning January 1, 2003.

 In discussing cases that have given vulgar and offensive speech First Amendment protection, the dissents lose sight of the fact that we are dealing here, not with the general context of the right of citizens to speak freely, but with the very specific context of the right of attorneys, who are licensed in terms of character and fitness and who serve as officers within our legal system, to engage in such speech in the course of their professional responsibilities. In conflating these two contexts, the various dissents lose sight of the governing legal standard. In Gentile, the United States Supreme Court supplied the standard for a First Amendment challenge to a professional conduct rule. The Court concluded that the state had an interest in the integrity of its judicial system and that the regulation at issue there was narrowly tailored, viewpoint neutral, and left open alternative avenues for expression. Gentile, supra at 1071-1076. Although First Amendment jurisprudence contains a plethora of colorful cases, including Cohen v California, 403 US 15; 91 S Ct 1780; 29 L Ed 2d 284 (1971), and Fed Communications Comm v Pacifica, 438 US 726; 98 S Ct 3026; 57 L Ed 2d (1978), we need not address every imaginable argument that could be marshaled from them. As in Chmura I, we are bound to apply the governing standard of Gentile, rather than consider and dispose of every possible objection that may be found in more “general” First Amendment jurisprudence.

 In Garrison v Louisiana, 379 US 64, 74; 85 S Ct 209; 13 L Ed 2d 125 (1964), overruled on other grounds by Curtis Publishing Co v Butts, 388 US 130, 134 (1967), the United States Supreme Court extended the Sullivan standard to criminal defamation cases. But, there are no criminal charges at issue here.

 Justice Cavanagh stated the following in his concurring statement:
This order should not be construed as signaling any reduced interest on the part of this Court in upholding standards of professional civility and in enforcing attorney discipline when allegedly libelous or slanderous remarks are made by attorneys. I believe that the respondent’s remarks here were irresponsible and reprehensible, but ultimately I would defer to the judgment of the Attorney Discipline Board that they were not sanctionable.... [469 Mich 1241.]

 Judges are also subject to courtesy or civility rules and may be sanctioned for violating such rules upon recommendation of the Judicial Tenure Commission. Canon 2(B) of the Michigan Code of Judicial Conduct similarly requires judges to treat others with courtesy. MCR 9.205(B)(1) also requires judges to treat others with courtesy and respect. We have not ignored this requirement. See, e.g., In re Moore, 464 Mich 98, 122, 131-133; 626 NW2d 374 (2001), in which we suspended a judge after we concluded, among other things, that he had violated Code of Judicial Conduct, Canons 2(B) and 3(A) by making abusive, berating, and sarcastic comments to jurors, defendants, and attorneys. See, also, In re Del Rio, 400 Mich 665, 716-722; 256 NW2d 727 (1977), in which we sanctioned a judge after we concluded that he had violated Canons 2(B) and 3(A) by making crass comments, engaging in extended tongue-lashings, and making threats of retaliation against attorneys who appeared in his courtroom.

 This Court explained over 100 years ago in In re Mains, 121 Mich 603, 608-609; 80 NW 714 (1899), that an attorney has no right to so conduct himself or herself as to dishonor his or her profession or to bring the courts of this state into disrepute.

 Indeed, we believe that even a casual observer of Michigan government will not fail to recognize that there have been many full-throated and aggressive comments made in recent years by some members of the State Bar of Michigan concerning the performance of the courts of this state, including this Court.

 Justice Kelly inexplicably suggests that under our opinion, the “mere utterance of dissatisfaction could subject an attorney to harmful sanctions.” Post at 370. This is entirely baseless, as we have clearly indicated that judge’s are not beyond criticism.

 Given the position advanced by the dissenting justices in this case and in Maldonado v Ford Motor Co, 476 Mich 372; 719 NW2d 809 (2006), *265 one wonders whether the dissenting justices would simply surrender the legal process to the least-restrained and worst-behaved members of the bar. With increasingly little need to adhere to the rules necessary to ensure public confidence in the integrity of the legal process, the dissenters would create a world in which legal questions come increasingly to be decided, not by a fair and rational search for truth, but by bullying and uncivil behavior, personal abuse, one-upmanship, and public exhibitionism on the part of those who are custodians of this system, the bar. Justice under the law cannot flourish within such a system.

 For a glimpse into the likely future, see 111 Sup Ct R 67, which provides:
(3) A candidate for a judicial office:
(e) may respond to personal attacks or attacks on the candidate’s record as long as the response does not violate subsection A(3)(d).