YOUNG, J.
Consistent with the Court’s 170-year-old disqualification practice, I do not participate in the determination whether Justice HATHAWAY should disqualify herself. I join in Justice CORRIGAN’S dissenting statement concerning the Caperton* [1] question. I believe that this new United States Supreme Court opinion has radically altered the landscape of judicial disqualification and this change warrants that this Court at least entertain argument by the parties about how Caperton might affect the pending disqualification motion.
However, given Justice HATHAWAY’s stated position on disqualification matters, I also write to raise questions about the casual way she has chosen to decide this motion and how her response may bear on the extra-constitutional disqualification proposals currently under consideration by this Court.
*61 New issues have been the subject of more continual and contentious debate on this Court in the last decade than the appropriate standard that should apply in the disqualification of justices.[2] Justice HATHAWAY, who is now the subject of a disqualification motion in these cases, dismisses our efforts to comment on this issue as “inappropriate,” “unnecessary,” and a waste of taxpayer dollars. Such questions, however, are a traditional part of the debate and discussion inherent in the judicial process. It is, for example, why this Court holds oral arguments, and why it welcomes briefs, responses to briefs, and even replies to responses to briefs. By this process we educate ourselves and hopefully arrive at better decisions. Justice HATHAWAY either fails to appreciate the nature of the judicial process or simply seeks to avoid the hard questions about the inadequacies of her own extraordinarily limited response to the disqualification motion. This is particularly evident because one of the central themes of Justice HATHAWAY’s late Michigan Supreme Court campaign was her assertion that she subscribed to an “appearance of impropriety” disqualification standard and was, therefore, “more ethical” than the members of the previous philosophical majority — former Chief Justice TAYLOR and Justices Corrigan and Markman and I.[3]
*62 THE NATURE OF THE ALLEGATIONS AGAINST JUSTICE HATHAWAY
Defendant Michigan Catastrophic Claims Association (MCCA) has asserted that Justice HATHAWAY’s husband is a no-fault plaintiffs’ attorney who stands to profit in his no-fault practice if Justice HATHAWAY participates in these cases to overturn a decision made by this Court just months ago. The thrust of this claim is that a reversal of our earlier opinion will remove the legal basis, and thus the incentive, for insurance companies to resist unreasonable no-fault settlements demanded by claimants and their attorneys. Consequently, because insurance companies will be free to pass on these unreasonable settlements to the MCCA (which will eventually be paid for by the public, who must buy no-fault insurance), no-fault practitioners will increase their contingency fee yields by obtaining higher settlements than warranted.[4] A reversal will cost *63 purchasers of Michigan no-fault insurance an aggregate of $693.8 million more this year alone, accounting, in large part, for a more than 19 percent increase in the catastrophic claims premium every automobile no-fault insurance policy issued in this state will bear, which increase the MCCA’s board of directors has already approved in anticipation of Justice HATHAWAY’s critical vote to reverse the Court’s prior decision. See the affidavit filed by the MCCA in Docket No. 133466, which is one of the documents referred to in n 2 of Justice Hathaway’s statement.
Despite this, and without bothering to explain why, Justice HATHAWAY simply denies that she should be disqualified, adding that there is no appearance of impropriety in her participation. Justice HATHAWAY does not even deign to deny that her husband is a no-fault plaintiffs’ practitioner or to assert that his practice will not benefit from her participation in a decision to overturn this Court’s prior decision.
Justice HATHAWAY’s refusal to live up to her own expressed standard of conduct is worthy of note in its own right: The people of this state deserve to know whether candidates promise one thing when running for office but deliver another when elected. But the far more important issue is the horror that would be visited on this Court if Justice HATHAWAY’s preferred “appearance of impropriety” disqualification standard were actually adopted.
HOW MAY A JUSTICE REBUT AN “APPEARANCE OF IMPROPRIETY”?
Justice HATHAWAY has provided no information in response to defendant’s allegations of her family’s fi *64 nancial interest in a reversal of the Court’s prior decision; surely her terse and conclusory statement is not what the people envisioned when they elected a candidate vowing to adhere to a “higher” “appearance of impropriety” disqualification standard. Ought not such a standard require that the target of the disqualification motion provide financial statements[5] or that an evidentiary hearing be conducted to determine the merit of the allegations of disqualification?[6]
WHAT SUFFICES TO ESTABLISH AN “APPEARANCE OF IMPROPRIETY”?
According to Justice HATHAWAY, allegations of a spouse’s “economic interest in the subject matter in controversy” or “more than de minimis interest that could be substantially affected by the proceeding”— grounds requiring recusal under MCR 2.003(B)(5) and (6)(c) — are so irrelevant as to not even merit a discussion in her statement. If these allegations of increased *65 family profit as a result of her participation in these cases do not establish an appearance of impropriety, what would.[7]
WHO WILL DETERMINE WHETHER THERE IS AN “APPEARANCE OF IMPROPRIETY”?
For the first time to my knowledge, members of the Court have participated in the merits of a disqualification decision on a motion addressed to another justice. Although Justices CAVANAGH and WEAVER and Chief Justice KELLY have joined and endorsed Justice HATHAWAY’s decision, they have done so solely on the basis of Justice HATHAWAY’s statement without any additional inquiry into the merits of her participation or the allegations raised. In this, their participation is merely a rote ratification of Justice HATHAWAY’s cursory denial of the motion to disqualify.
The new majority’s approval of and participation in the merits of the determination whether Justice HATHAWAY should be disqualified, while an alteration of our traditions, is consistent with several of the Court’s pending disqualification proposals that require full Court participation or that of the Chief Justice.7 [8] With *66 out question, lodging such a determination with other justices of this Court will, at best, lead to gamesmanship to change the philosophical composition of the Court to alter the result in each such case. I ask: Would a 4-3 decision by the members of the Court favoring participation of a challenged justice cause the public to have greater or lesser faith that the targeted justice should ethically participate?
HOW WOULD SUCH A PROCEDURE BETTER SERVE THE PEOPLE OF THIS STATE THAN THE NEARLY 200-YEAR-OLD CURRENT DISQUALIFICATION PRACTICE?
These are but a few of the questions raised by Justice HATHAWAY’S disposition of the pending motion to disqualify her. Given Justice HATHAWAY’S campaign promises and our colleagues’ published statements on disqualification over the years, not only the parties, but the public deserve more.

 Caperton v A T Massey Coal Co, Inc, 556 US _; 129 S Ct 2252; 173 L Ed 2d 1208 (2009).

 See, e.g., Adair v Michigan, 474 Mich 1027, 1038-1039 (2006) (statement of Taylor, C.J., and Markman, J.); Grievance Administrator v Fieger, 476 Mich 231, 266-281 (2006) (opinion by Taylor, C.J., and Corrigan, Young, and Markman, JJ.); Scalise v Boy Scouts of America, 473 Mich 853 (2005); In re JK, 468 Mich 202, 219 (2003) (statement by Weaver, J.); Gilbert v DaimlerChrysler Corp, 469 Mich 883 (2003), reconsideration denied 469 Mich 889 (2003). Justice Weaver has also provided her own personalized history of this debate in her statement endorsing Justice Hathaway’s continued participation in these cases.

 The following was part of Justice Hathaway’s campaign: “Our Supreme Court is not being fair and impartial. ... They are not recusing themselves and that is the problem; we need judges who are going to be *62 fair and impartial in rendering their decisions and that is not happening.” Interview with Lansing State Journal (October 17, 2008). She quipped that former Chief Justice Taylor was a “walking conflict of interest” because his wife had worked in the Governor’s office, <http://www.youtube.com/ watch?v=_7woWJDklQg> (accessed June 16, 2009). It was never alleged that former Chief Justice Taylor’s wife stood to benefit financially from her husband’s role on this Court, as defendant here suggests that Justice Hathaway’s husband will. See Adair, supra at 1028 n 1. Finally, Justice Hathaway pledged to the people who elected her, “I have, and I will continue to disqualify myself whenever there is the appearance of impropriety,” League of Women Voters of Michigan Voter Guide 2008 <http://www.lwvmi.org/documents/LWV08SupremeCourt.pdf> (accessed June 16, 2009) (emphasis added), and, “I have a habit of recusing myself if I think that there is even an appearance of impropriety,” Interview with Lansing State Journal (October 17, 2008).

 The MCCA is a nonprofit association created by the Legislature to ensure that there are sufficient resources to fund benefits under our no-fault law for the catastrophically injured. See MCL 500.3104. Under our prior decision, the MCCA has authority to reject unreasonable claims when a member insurer’s policy only provides coverage for “reasonable charges.” United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass’n, 482 Mich 414, 417 (2008). The MCCA contends *63 that a reversal of the Court’s decision will cause a dramatic increase in its exposure and the cost of insurance that it will pass along to the purchasers of no-fault insurance.

 During her campaign, Justice Hathaway affirmatively supported other financial disclosures: “I believe that there should be disclosure of all election campaign spending.” Michigan Campaign Finance Network, Questionnaire for 2008 Michigan Supreme Court Candidates, p 1 <http://www.mcfn.org/pdfs/reports/SCquestionnaire.pdf> (accessed June 16, 2009). Indeed, several member organizations of the Coalition Protecting Auto No-Fault, which has filed an amicus curiae brief in these cases supporting Justice Hathaway’s continued participation, supported Justice Hathaway’s campaign. The Michigan Trial Lawyers Association and the United Automobile Workers each gave $34,000 to Justice Hathaway’s campaign, the maximum allowed by law. During her campaign, Justice Hathaway stated that “a judge should consider!] disqualifying herself in any instance where a party has made a substantial campaign contribution.” Id. In Justice Hathaway’s calculus of disqualification ethics, do such contributions not raise “even the mere appearance of impropriety”? Id. at 2.

 And why, having promised a "higher standard of conduct” if elected, is it defensible for Justice Hathaway to shelter under the Court’s historical disqualification practice that she disparaged on the campaign trail?

 Moreover, do the fact that the motion for rehearing in these cases was prompted solely because of Justice Hathaway’s replacement of Chief Justice TAYLOR and the fact that utterly no new substantive or legal arguments were raised in the motion, as generally required by MCR 2.119(F)(3), give rise to an appearance of impropriety with respect to her participation? See, e.g., Peoples v Evening News Ass’n, 51 Mich 11, 21 (1883), in which this Court opined that “a rehearing will not be ordered on the ground merely that a change of members of the bench has either taken place or is about to occur.”

 It is unclear why Justice Hathaway and the new majority chose to adopt some aspects of the new proposals while claiming to adhere to our current disqualification practice. As stated, Justices CAVANAGH and Weaver and Chief Justice Kelly have never, to my knowledge, publicly endorsed the decision of another justice targeted with a disqualification *66 motion, as they have done here. However, because they considered nothing beyond Justice Hathaway’s statement, it is hard to understand what their endorsement adds, other than being a statement of solidarity.