# Order

**Michigan Supreme Court**
**Lansing, Michigan**

July 21, 2009

133466 (100)
133468 (61)

Marilyn Kelly,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway,
Justices

UNITED STATES FIDELITY INSURANCE &
GUARANTY COMPANY,
        Plaintiff-Appellee,

v

                                     SC: 133466
                                     COA: 260604
                                     Oakland CC: 2003-051485-CK

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,
        Defendant-Appellant,

and

MICHAEL MIGDAL, Individually and as
Conservator for the Estate of DANIEL MIGDAL,
a Protected Person,
        Defendant.
_____/

HARTFORD INSURANCE COMPANY OF THE
MIDWEST,
        Plaintiff-Appellee,

v

                                       SC: 133468
                                     COA: 271199
                                     Oakland CC: 2006-071933-CK

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,
        Defendant-Appellant.
_____/

        On order of the Court, the motion for recusal is considered, and it is DENIED.

HATHAWAY, J.  On March 27, 2009, this Court issued an order granting rehearing in this matter.[1]  Since that time, defendant Michigan Catastrophic Claims Association (MCCA) has filed a motion asking me to recuse myself.  The nature of the objection is well described in the parties' briefs and responses thereto.[2]  I have reviewed these pleadings in detail.

I have also had an opportunity to review *Caperton v A T Massey Coal Co, Inc*, 556 US __ (No. 08-22, decided June 8, 2009), and the briefs filed by the parties regarding this new decision.  In reviewing whether there was a due process violation in the refusal of Justice Benjamin[3] to disqualify himself, the United States Supreme Court held as follows:

> We conclude that there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent . . . .
>
> * * *
>
> Our decision today addresses an *extraordinary* situation where the Constitution requires recusal. Massey and its *amici* predict that various adverse consequences will follow from recognizing a constitutional violation here—ranging from a flood of recusal motions to unnecessary interference with judicial elections. We disagree. *The facts now before us are extreme by any measure.* The parties point to no other instance involving judicial campaign contributions that presents a potential for bias comparable to the circumstances in this case.  [*Id*., slip op at 14, 16-17 (emphasis added).]

Given this test, I find no arguable due process violation in the cases before me. There is nothing alleged by the MCCA that would cause any reasonable person to believe that there is a significant and disproportionate influence being asserted upon me under any objective analysis.

---

[1] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 483 Mich 913 (2009).

[2] The motion and related documents, including all the briefs of the parties and the amici curiae, may be viewed at <http://courts.michigan.gov/supremecourt/Clerk/10-08/133466-133468/133466-133468-Index.htm>.

[3] Justice Benjamin sits on the West Virginia Supreme Court of Appeals and had received in excess of $3 million in financial support to his campaign from the individual who was chairman, chief executive officer, and president of the defendant in the case before him.

Despite the theories proffered by the MCCA, my husband has no connection to or financial interest in this matter. He is not an attorney for or employee of any party, nor is he a litigant in either of these cases. He has no relationship with either the attorneys or the litigants in these cases. The MCCA asserts that, because my spouse has handled cases in the field of no-fault insurance law, I must recuse myself. However, this assertion suggests a basis for recusal that is so attenuated from the facts of these cases that it strains reasoned logic.

This is not to say that parties should be impeded from bringing such motions. However, not every hypothetical theory proffered by a litigant must be accepted as accurate or controlling. The issue to be decided is one of due process. Any alleged due process claim must be evaluated by an objective standard. Due process does not require that a justice recuse himself or herself merely because the justice's spouse or child is an attorney practicing in the field of law that is involved in the disputed case, just as due process would not require a justice's recusal in all medical malpractice cases merely because the justice's spouse is a physician or require a justice's recusal in all cases involving school systems merely because the justice's spouse is a teacher.

In conclusion, I have no personal bias or prejudice for or against any party in this matter. Moreover, neither I nor any member of my immediate family has any real or arguable financial interest in this case. The allegations made by the MCCA are not a basis for recusal because there is no appearance of impropriety and no due process violation. Accordingly, there is no reason to recuse myself.[4] Having carefully considered this motion for recusal, I deny it.[5]

KELLY, C.J., and CAVANAGH, J., concur.

---

[4] Currently, there are no rules governing the recusal of justices. On March 18, 2009, a majority of this Court voted to publish for comment various proposals for rules that would govern the recusal of justices. 483 Mich 1205 (2009). Until such time as comprehensive rules governing the recusal of justices in Michigan are adopted, I will follow this Court's current practice whereby the justice from whom recusal is sought decides the motion for recusal. Michigan's current recusal practice is the same as that of the United States Supreme Court, and there is no indication in *Caperton* that this practice violates due process.

[5] While I do not acquiesce to the statements of Justices Corrigan, Markman, and Young, I will not participate in this Court's practice of engaging in responses to comments of others that are inappropriate and unnecessary. This Court should discontinue devoting the state's limited resources to unproductive colloquy.

WEAVER, J.  I agree with Justice Hathaway's denial of the recusal motion because due process is not violated in this case.

I take this opportunity to provide some history on the issue of disqualification in this Court.  Since 2003, I have raised the issue of the need for clear, written, and fair disqualification rules for Michigan Supreme Court justices,[6] but the "majority of four" (former Chief Justice Taylor and Justices Corrigan, Young, and Markman) refused to address the issue.  When this Court looked at the issue of disqualification in 2006, the "majority of four" refused to publish proposed disqualification rules formulated by members of this Court.

In March of this year, after former Chief Justice Taylor's removal from this Court as a result of his overwhelming defeat in the 2008 election, the "remaining three" (Justices Corrigan, Young, and Markman) voted against publishing proposed rules for disqualification.  Fortunately, a majority voted in March to publish, for public comment until August 1, 2009, three proposals for rules of disqualification[7] to be considered at a public hearing later in 2009.  Of the proposals published by this Court in March, I note that Alternative C sufficiently provides the due process protections laid out by the United States Supreme Court in the recent decision of *Caperton v A T Massey Coal Co, Inc*, 556 US ___ (No. 08-22, decided June 8, 2009).

---

[6] See, e.g., the statements or opinions by Weaver, J., in *In re JK*, 468 Mich 202, 219 (2003); *Gilbert v DaimlerChrysler Corp*, 469 Mich 883 (2003); *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 472 Mich 91, 96 (2005); *McDowell v Detroit*, 474 Mich 999, 1000 (2006); *Stamplis v St John Health Sys*, 474 Mich 1017 (2006); *Heikkila v North Star Trucking, Inc*, 474 Mich 1080, 1081 (2006); *Lewis v St John Hosp*, 474 Mich 1089 (2006); *Adair v Michigan*, 474 Mich 1027, 1044 (2006); *Grievance Administrator v Fieger*, 476 Mich 231, 328 (2006); *Grievance Administrator v Fieger*, 477 Mich 1228, 1231 (2006); *People v Parsons*, 728 NW2d 62 (2007); *Ruiz v Clara's Parlor, Inc*, 477 Mich 1044 (2007); *Neal v Dep't of Corrections*, 477 Mich 1049 (2007); *State Automobile Mut Ins Co v Fieger*, 477 Mich 1068, 1070 (2007); *Ansari v Gold*, 477 Mich 1076, 1077 (2007); *Short v Antonini*, 729 NW2d 218, 219 (2007); *Flemister v Traveling Med Services, PC*, 729 NW2d 222, 223 (2007); *McDowell v Detroit*, 477 Mich 1079, 1084 (2007); *Johnson v Henry Ford Hosp*, 477 Mich 1098, 1099 (2007); *Tate v City of Dearborn*, 477 Mich 1101, 1102 (2007); *Dep't of Labor & Economic Growth v Jordan*, 480 Mich 869 (2007); *Cooper v Auto Club Ins Ass'n,* 739 NW2d 631 (2007); and *Citizens Protecting Michigan's Constitution v Secretary of State and Reform Michigan Government Now! (RMGN)*, 482 Mich 960 (2008).

Also see my personally funded website, justiceweaver.com.

[7] These three proposals are the same proposals that the "majority of four" refused to publish in 2006.

I also note that the United States Supreme Court's *Caperton*[8] discussion of disqualification with regard to campaign contributions for justice elections raises further issues with regard to due process concerns. Currently, this Court has no rules providing for a justice's disclosure of campaign contributions when parties to cases, or the parties' immediate family members, contribute significant amounts of money, directly or indirectly, to a justice's campaign.[9] Hopefully this Court, the Legislature, and/or the public will create disclosure rules that will ensure the protection of due process rights.

CORRIGAN, J. I would not resolve the recusal motion of defendant Michigan Catastrophic Claims Association (MCCA) at this time. Rather, I would order supplemental briefing of the application of *Caperton v A T Massey Coal Co, Inc*, 556 US ___ (2009) (No. 08-22, decided June 8, 2009) (*Caperton*), to these cases. *Caperton* addressed the disqualification of a judge when a party alleges that the judge's interest in a case requires recusal under the Due Process Clause of the federal constitution. To weigh whether recusal is required, *Caperton* requires an assessment of whether a serious, objective risk of actual bias exists that requires the judge to recuse himself or herself. Because the MCCA argues that Justice Hathaway's participation in these cases violates its federal due process rights, *Caperton* is relevant and could prove controlling. Indeed, the MCCA has submitted *Caperton* to this Court as supplemental authority in support of its motion.

The scope of *Caperton* and how courts will implement it present significant unanswered questions, particularly for our Court. *Caperton* held that a state supreme court justice was disqualified from hearing a case involving a corporate party whose chairman and CEO had expended $3 million to support the justice's campaign, although the individual expended this money independently and through donations to an independent political group. *Caperton*, *supra*, slip op at 2-3. The Court concluded that the justice was disqualified although he professed that the funds were solicited and expended without his knowledge, direction, or control under state election laws very similar to our own. See *Caperton v A T Massey Coal Co, Inc*, ___ W Va ___; ___ SE2d ___ (Docket No. 33350, decided April 3, 2008, concurring opinion issued July 28, 2008), slip op at 42-47 (*W Va Caperton*) (Benjamin, acting C.J., concurring). Indeed, Michigan allows independent political groups to expend unlimited money during

---

[8] Justices Corrigan and Young and former Chief Justice Taylor filed an amicus curiae brief in the *Caperton* case in opposition to the plaintiff Caperton's ultimately successful appeal.

[9] Beyond due process issues involving campaign contributions, I further note that this Court does not have rules ensuring due process by requiring disclosure by justices of their former representation as attorneys of parties appearing before the Court, regardless of how far in the past the representation may have been.

elections, often without being required even to reveal their funding sources.[10] For example, during the 2008 election cycle, independent expenditures aimed at the race for Justice Hathaway's current seat on this Court topped $3.75 million.[11]

For these reasons, in my view, deciding the MCCA's recusal motion within days of *Caperton* is precipitous. *Caperton* was released on June 8, 2009. We have hardly had time to digest the opinion, much less its ramifications, particularly given that the opinion is positively Delphic in explaining the standards for courts attempting to implement it. Four justices of this Court now vote, without any explanation or the benefit of fact-finding, to support Justice Hathaway's decision to participate in these

---

[10] The Michigan Campaign Finance Act, MCL 169.201 *et seq.,* does not regulate certain expenditures, including those "for communication on a subject or issue if the communication does not support or oppose a ballot question or candidate by name or clear inference." MCL 169.206(2)(b). See also *Right to Life of Michigan, Inc v Miller*, 23 F Supp 2d 766, 767 (WD Mich, 1998), quoting *Buckley v Valeo,* 424 US 1, 44 & n 52 (1976) (observing that Michigan is prohibited from regulating speech protected by the "express advocacy" test established in *Buckley*, which permits regulation only of "communications that 'in express terms advocate the election or defeat of a clearly identified candidate,'" such as those employing "'express words of advocacy of election or defeat, such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," "reject"'"); *Planned Parenthood Affiliates of Michigan, Inc v Miller,* 21 F Supp 2d 740, 745 (ED Mich, 1998) (noting that Michigan is prohibited under *Buckley* from regulating "issue advocacy"). Therefore, in practice, many major expenditures, including those for television ads, are not covered by our reporting laws. See Michigan Campaign Finance Network, 2008 Citizen's Guide to Michigan Campaign Finance, p 14 <http://www.mcfn.org/pdfs/reports/ MCFNCitGuide08.pdf> (accessed June 18, 2009) (hereinafter "MCFN Citizen's Guide") ("[A]dvertisements that define[] the character and qualifications of the candidates without explicitly exhorting a vote for or against either candidate" are "not considered to be campaign expenditures and the sources of money that paid for the ads are not required to be disclosed."). Accordingly, although a major expenditure may ultimately benefit a candidate, the expenditure—and its funding sources—may be outside the candidate's awareness and control. Further, even regulated "independent expenditures" by third parties, which must be reported if they support a candidate, *must* be made without the direction or control of the candidate. MCL 169.209(2); MCL 169.251.

[11] MCFN Citizen's Guide, p 14; see also Michigan Campaign Finance Network, *Anonymous donors dominated Supreme Court campaign*, November 19, 2008 <http://www.mcfn.org/press.php?prId=77> (accessed June 18, 2009) ("More than 60 percent of spending for the Michigan Supreme Court campaign between incumbent Chief Justice Clifford Taylor and Judge Diane Marie Hathaway will not be disclosed in any campaign finance report because it paid for candidate-focused 'issue' advertising.").

cases. Thus, although we have had little time to study *Caperton* and do not have the benefit of briefing on it, the Court proceeds essentially to hold that such a vote is a mandatory procedure for all recusal motions raising due process concerns.[12]

### The MCCA's Motion for Recusal

The most relevant aspects of the MCCA's motion follow. After this Court issued its March 2009 decision to grant reconsideration[13] of its December 2008 decision,[14] occasioned by newly elected Justice Hathaway's participation in these cases, the MCCA moved for her recusal. Specifically, the MCCA argues that Justice Hathaway's husband, Michael Kingsley, has an interest that could be substantially affected by the outcome of the proceedings because he is a practicing plaintiffs' no-fault attorney in

---

[12] This occurs although *Caperton* has sparked much debate concerning its application. For example, *Michigan Lawyers Weekly* quoted former Michigan State Supreme Court Chief Justice Clifford Taylor as stating that *Caperton* "'has to mean that the challenged justice can't make the recusal decision alone.'" *MSC recusal rule may not be constitutional*, Michigan Lawyers Weekly, June 15, 2009, p 23. Chief Justice Kelly also asserted, in a recent press release, that *Caperton* "'signals that we do need to have appropriate protections in place'" and "will assist the Michigan Supreme Court as it develops its own disqualification rules for justices." Michigan Supreme Court, Office of Public Information, Caperton *ruling by U.S. Supreme Court highlights importance of fair and impartial justice, says Michigan Supreme Court Chief Justice Marilyn Kelly*, June 9, 2009 <http://courts.michigan.gov/supremecourt/Press/060909-CapertonDQ.pdf> (accessed June 18, 2009). Wayne County Assistant Prosecuting Attorney Timothy Baughman, on the other hand, "[r]espectfully" but "heartily" disagreed with former Chief Justice Taylor's comments, asserting in a *Michigan Lawyers Weekly* Viewpoint comment:

> *Caperton* is a case about standards and not about the identity of the decision-maker. . . .
>
> * * *
>
> Nothing in *Caperton* requires that the decision on a recusal motion be reviewed by another justice or body of justices. For the Michigan Supreme Court [to continue] to follow the practice of the U.S. Supreme Court is perfectly permissible, so long as a system of "objective rules" exists. ['*Caperton' was about recusal standards, not decision maker*, Michigan Lawyers Weekly, June 22, 2009, p 7.]

[13] United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n, 483 Mich 913 (2009).

[14] United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n, 482 Mich 414 (2008).

Michigan. As such, he has a direct interest that is more than *de minimis* in the MCCA's unlimited obligations to reimburse insurers for personal protection insurance benefits paid to insureds who have been catastrophically injured in automobile accidents.[15] The MCCA further asserts that it reimburses insurers for payments made to Kingsley's clients, having made such a reimbursement as recently as April 9, 2009.[16] The MCCA's

---

[15] The MCCA has an unlimited statutory obligation to reimburse insurers for 100 percent of claims paid to insureds whose losses due to personal injury exceed certain statutory caps; the current cap is $460,000. MCL 500.3104(2)(i) and (7)(a). As is further explained by Justice Young, *post* at 15, the MCCA asserts that reversal of this Court's prior opinion on rehearing will require the MCCA to reimburse all benefits paid by insurers to their catastrophically injured insureds, without regard to the reasonableness of the insured's underlying expenditures. Accordingly, the MCCA states that its insurer members will have little incentive to defend unreasonable claims by their insureds; no matter how unreasonable the expenditure—at issue in one of these cases, for example, are an insured's expenditures of $54.84 an hour for attendant care services—if the insurer accepts its insured's claim, the MCCA will be obligated to reimburse the insurer in full. The MCCA asserts: "With a guarantee of MCCA reimbursement, coupled with the lure of saving legal defense costs, members will have a strong motive to settle [personal protection insurance] claims early and with little or no resistance." It concludes: "This directly benefits lawyers like Mr. Kingsley who represent plaintiffs in no-fault automobile insurance cases, and who typically receive their fees out of the proceeds of settlements." To illustrate, the MCCA has provided a hypothetical conversation between a future plaintiff's attorney and an insurer:

> [Attorney]: "I know that amount is a bit high for attendant care, but that is what we want. We'll sue to get it and we'll seek attorney fees and penalties too. [See MCL 500.3148(1).] Do you want that?"
>
> Insurer: "Of course not, but that amount is unreasonable."
>
> [Attorney]: "What does reasonable have to do with it? [The] MCCA has to pay you regardless. Do you want to incur three times that amount in attorney fees instead?"
>
> Insurer: "Of course not."

[16] MCR 2.003(B)(5) provides in part that a judge is disqualified from hearing a case if "the judge's spouse . . . has an economic interest in the subject matter in controversy . . . or has any other more than de minimis interest that could be substantially affected by the proceeding." MCR 2.003(B)(6)(c) also provides that a judge is disqualified if the "judge or the judge's spouse . . . is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding[.]" Similarly, the United States Supreme Court requires recusal with regard to a justice's spouse if "'the amount of the relative's compensation could be substantially affected by the outcome' . . . ." See *Adair v Michigan*, 474 Mich 1027, 1031 (2006) (statement of Taylor, C.J., and Markman, J.),

obligation to reimburse insurers—and the potential resulting benefits to plaintiffs' attorneys—is directly at issue in these cases. Indeed, the MCCA asserts that it has raised the amounts needed to pay expected claims and its reserves by almost $694 million in anticipation of this Court's likely reversal on rehearing of its prior decision, stemming from the participation of newly elected Justice Hathaway in the decision after rehearing. The MCCA further states that this increase is the primary cause of the 19 percent increase in its assessments for catastrophic coverage this year, which affects all no-fault insurance policy holders' rates. The MCCA claims that if, on rehearing, this Court prohibits the MCCA from engaging in a "reasonableness" inquiry, see n 6 of this statement, attorneys will reap the rewards at the expense of Michigan drivers, whose insurance rates will rise to support the resulting increased systemic costs.[17]

## The *Caperton* Decision

In *Caperton*, the United States Supreme Court "underscore[d] the need for objective rules" and asserted that the Due Process Clause requires recusal motions to be decided "by objective standards that do not require proof of actual bias." *Caperton*, *supra*, slip op at 13. In concluding that recently elected West Virginia Supreme Court of Appeals Justice Brent Benjamin was disqualified from hearing the underlying case as a result of substantial campaign expenditures by the chairman, CEO, and president of the respondent company, A. T. Massey Coal Co., Inc., the Court held that "[d]ue process requires an objective inquiry" to establish whether the circumstances "'would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true.'" *Id.* at 15, quoting *Tumey v Ohio*, 273 US 510, 532 (1927). Significantly, the Court thus considered the purported facts underlying the motion for recusal, see *Caperton*, *supra*, slip op at 14,[18] and concluded, on the basis of its assessment of those facts, that "there was . . . a serious, objective risk of actual bias," *id.* at 16.

---

quoting the United States Supreme Court's Statement of Recusal Policy, November 1, 1993.

[17] No-fault automobile negligence cases remain a dominant factor in Michigan civil filings every year. Of the 46,216 new civil filings in Michigan circuit courts in 2008, 8,477—or more than one fifth of all civil cases—were automobile related. See 2008 Annual Report of the Michigan Supreme Court, p 30 <http://www.courts.michigan.gov/scao/resources/publications/statistics/2008/2008execsum.pdf> (accessed June 18, 2009). Further, because many, if not most, no-fault claims settle out of court, the number of claims potentially affected by this Court's ruling is much higher than the number of cases filed.

[18] Somewhat confusingly, the Court considered the purported facts underlying the recusal motion, but also conceded that there was "no procedure for judicial factfinding . . . ." *Caperton*, *supra*, slip op at 15.

Questions Raised by *Caperton*

In light of the *Caperton* opinion, I do not think that we can resolve the MCCA's recusal motion—which squarely raises due process concerns—without first addressing the following questions:

- Does this Court's historical recusal practice—which permits each justice to decide motions for his or her recusal and which Justice Hathaway follows here—comport with the *Caperton* Court's requirement for objective standards? Justice Hathaway states: "Because neither I nor any member of my immediate family has any financial interest in this case, and because I have no personal bias or prejudice for or against any party in this matter, there is no appearance of impropriety nor any Due Process violation." *Ante* at 3. She adds: "Given [the *Caperton*] test, I find no arguable due process violation in the cases before me. There is nothing alleged by MCCA that would cause any reasonable person to believe that there is a significant and disproportionate influence being asserted upon me under any objective analysis." *Ante* at 3. But the challenged justice in *Caperton* issued similar statements in which he declined to recuse himself, explaining that the moving party had provided no objective evidence of actual bias and expressing his subjective opinion that none of his motives were improper. *Caperton*, *supra*, slip op at 12. Indeed, West Virginia's recusal rules are strikingly similar to the practice followed by this Court. See *W Va Caperton*, *supra*, slip op at 38-39. Like Justice Hathaway—albeit while providing extensive factual detail concerning the allegations against him and legal precedent on the subject of recusal—Justice Benjamin asserted: "I have no pecuniary interest in the outcome of this matter. . . . I have no personal involvement with nor harbor any personal antipathy toward any party or counsel herein." *Id.* at 27-28. He added: "[N]o improper act or conduct, and no appearance of an improper act or conduct with respect to this case, or any other case, has occurred on my part[.]" *Id.* at 36. "Simply put, I do not have, nor was there any evidence to show that I had a 'direct, personal, substantial, pecuniary interest' in this case." *Id.* at 39. Yet the United States Supreme Court concluded that his subjective assertions that he lacked actual bias were insufficient for constitutional purposes. *Caperton*, *supra*, slip op at 13. Particularly in light of the similarities between Michigan's and West Virginia's recusal practices—indeed, in both states recusal decisions have been left to the discretion of the individual justice whose recusal is sought, *W Va Caperton*, *supra*, slip op at 38—I simply cannot conclude without further study that the historic practice followed by Justice Hathaway today complies with *Caperton*. Nor can I conclude that Justice Hathaway may conclusively disavow any similarity to the facts of *Caperton* by simply offering her own opinion that "[t]here is nothing alleged by MCCA that would cause any reasonable person to

believe that there is a significant and disproportionate influence being asserted upon me based on any objective analysis." *Ante* at 3.

- Is it sufficient under *Caperton* that four justices of this Court have voted to support Justice Hathaway's decision here? Although *Caperton* expressly failed to address a proper method for fact-finding, the Court reached its decision by carefully considering the facts surrounding Justice Benjamin's election. Here the MCCA alleges that Justice Hathaway must recuse herself because her husband has more than a *de minimis* financial interest in the subject matter of these cases. The MCCA points to very recent payments it has just made to one of Mr. Kingsley's clients. It also alleges that it has raised the amounts needed to pay expected claims and its reserves by $693.8 million in anticipation of this Court's potential reversal on rehearing of its earlier ruling in these cases; it states that the rate hike will be necessary because, if we reverse, claimants such as Mr. Kingsley's clients will receive substantially higher payments—*which result in higher attorney contingency fees*—because insurers will have no legal basis for resisting unreasonable settlement demands made by plaintiffs' attorneys. Can we possibly decide whether these alleged facts establish that "'the probability of actual bias on the part of [Justice Hathaway] is too high to be constitutionally tolerable'" without first engaging in some kind of independent inquiry to test the claim and Justice Hathaway's summary denial of it?[19] See *Caperton*, *supra*, slip op at 1, quoting *Withrow v Larkin*, 421 US 35, 47 (1975).

---

[19] As former Chief Justice Taylor suggested to *Michigan Lawyers Weekly*: "'You can't set up the kind of test the U.S. Supreme Court created in *Caperton* without giving parties the opportunity to have a hearing . . . . Where else or how else will they be able to adduce the facts needed to meet the new objective test?'" *MSC recusal rule may not be constitutional*, Michigan Lawyers Weekly, June 15, 2009, p 23.

Moreover, as Justice Young intimates, the narrow *Caperton* holding—that, under some circumstances, an elected judge is disqualified from hearing a case on the basis of contributions to his or her campaign—is also directly implicated in this case and will continue to be regularly implicated in cases before this Court given the current state of Michigan election law. As it bears on this case, at her January 8, 2009, investiture ceremony, Justice Hathaway attributed her election to various organizations that supported her campaign. Investiture Ceremony for the Honorable Diane M. Hathaway, 483 Mich ___ (2009). Of particular note is her acknowledgment of the Michigan Association for Justice (MAJ); the MAJ has explicitly supported the defendants in these cases and filed an amicus curiae brief in support of the motion for rehearing. Organizations that supported Justice Hathaway's campaign, including the AFL-CIO, whose president, Mark Gaffney, acted as master of ceremonies at the investiture proceeding, are also members of the Coalition Protecting Auto No-Fault, which filed an amicus curiae brief in these cases opposing Justice Hathaway's recusal. Further, these cases involve insurance companies as parties. During her campaign, Justice Hathaway

regularly spoke out against insurance companies and suggested that she would not "'sid[e] with big insurance companies'" if she were elected to this Court. *Hathaway sworn in as MSC's 104th justice*, Michigan Lawyers Weekly, January 12, 2009, p 2. Upon her investiture as a justice of this Court, she told the *Detroit News*: "'For at least 10 years, the Michigan Supreme Court has been in favor of insurance companies . . . . [Now] I think we will see a lot more real justice out of this Supreme Court.'" *Michigan Supreme Court to swear in newest justice,* Detroit News, January 8, 2009. Under an objective *Caperton* inquiry*,* it seems inescapable that such comments must be analyzed to establish whether the circumstances "'offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true,'" *Caperton*, *supra*, slip op at 15, quoting *Tumey, supra at 532*, or suggest "a serious, objective risk of actual bias," *Caperton*, *supra*, slip op at 16.

Finally, I note the significant fact that *Caperton* provides no guidance concerning how to evaluate the effect of *anonymous* campaign expenditures, which are common in Michigan, as I discuss in n 1 of this statement. Indeed, anonymous and independent expenditures during the 2008 election season included $1.4 million garnered by the Democratic Party from undisclosed donors to underwrite a TV ad campaign impugning Justice Hathaway's opponent, former Chief Justice Taylor. *In Michigan courts, it's the public that's blindfolded*, Detroit Free Press, June 14, 2009. At this time, it is totally unclear how a court attempting to comply with *Caperton* would take such donations into account. As Justice Benjamin presaged in his *W Va Caperton* concurrence,

> every judicial officer in this state is subject to having to decide the merits of a case that involves a party or attorney who contributed to or supported, or, conversely, opposed his or her campaign for office. This now includes those who contribute to or support so-called Independent Expenditure Groups who engage in political campaigns completely independent of candidates of office.
>
> * * *
>
> If the Appellees' argument became the law, every judicial officer in this state would be disqualified from any and every case in which an independent nonparty organization over which the judicial officer had no control received contributions from individuals or groups which included a person or entity affiliated with a party or an attorney in the case, when the independent nonparty organization used its contributions to wage a campaign against the judicial officer's electoral opponent. Conversely, such a standard would likely require a judge also to recuse himself or herself when an independent expenditure group operated against the judge or supported the judge's opponent. Our judicial system would break down under such a standard for disqualification. [*W Va Caperton, supra*, slip op at 31, 42-43.]

I raise these concerns in part in light of the dissent filed by Chief Justice Roberts in *Caperton*. He asks, among 40 questions, whether—although a justice does not have an actual financial interest in the case—a litigant may challenge the justice's refusal to recuse himself or herself in federal district court under 42 USC 1983,[20] which permits a person deprived of a federal right by a state official to sue for damages. *Caperton*, *supra*, slip op at 9 (Roberts, C.J., dissenting). He also reasonably asks whether the parties are "entitled to discovery with respect to the judge's recusal decision" and, "[i]f a judge erroneously fails to recuse, do we apply harmless-error review?" *Id.* at 10 (Roberts, C.J., dissenting). As he suggests, the ramifications of *Caperton* are broad. This Court should seriously consider how to properly dispose of a "*Caperton* claim"[21] alleging that the probability of a justice's bias disqualifies that justice under the Due Process Clause.

I would thus invite thorough supplemental briefing on these significant issues before disposing of the MCCA's recusal motion. Because the majority has chosen to precipitously resolve this disqualification motion, I dissent.

YOUNG, J. Consistent with the Court's 170-year-old disqualification practice, I do not participate in the determination whether Justice Hathaway should disqualify herself. I join in Justice Corrigan's dissenting statement concerning the *Caperton*[22] question. I believe that this new United States Supreme Court opinion has radically altered the landscape of judicial disqualification and this change warrants that this Court *at least* entertain argument by the parties about how *Caperton* might affect the pending disqualification motion.

However, given Justice Hathaway's stated position on disqualification matters, I also write to raise questions about the casual way she has chosen to decide this motion and how her response may bear on the extraconstitutional disqualification proposals currently under consideration by this Court.

Few issues have been the subject of more continual and contentious debate on this Court in the last decade than the appropriate standard that should apply in the

Clearly, without the benefit of further study and a process for objective fact-finding, this Court is ill-equipped to properly resolve the complex questions presented by *Caperton*.

[20] The summary nature of the majority's treatment of this disqualification motion indeed may lead the MCCA to test its due process claim in federal court under 42 USC 1983 rather than in this Court. This is yet another reason why we should allow the parties to brief the *Caperton* due process question.

[21] See *Caperton*, *supra*, slip op at 1 (Scalia, J., dissenting).

[22] *Caperton v A T Massey Coal Co, Inc*, 556 US ___ (No. 08-22, decided June 8, 2009).

disqualification of justices.[23]   Justice Hathaway, who is now the subject of a disqualification motion in these cases, dismisses our efforts to comment on this issue as "inappropriate," "unnecessary," and a waste of taxpayer dollars.   Such questions, however, are a traditional part of the debate and discussion inherent in the judicial process.   It is, for example, why this Court holds oral arguments, and why it welcomes briefs, responses to briefs, and even replies to responses to briefs.   By this process we educate ourselves and hopefully arrive at better decisions.   Justice Hathaway either fails to appreciate the nature of the judicial process or simply seeks to avoid the hard questions about the inadequacies of her own extraordinarily limited response to the disqualification motion.   *This is particularly evident because one of the central themes of Justice Hathaway's late Michigan Supreme Court campaign was her assertion that she subscribed to an "appearance of impropriety" disqualification standard and was, therefore, "more ethical" than the members of the previous philosophical majority—* former Chief Justice Taylor and Justices Corrigan and Markman and I.[24]

The Nature of the Allegations Against Justice Hathaway

---

[23] See, e.g., *Adair v Michigan,* 474 Mich 1027, 1038-1039 (2006) (statement of Taylor, C.J., and Markman, J.); *Grievance Administrator v Fieger*, 476 Mich 231, 266-281 (2006) (opinion by Taylor, C.J., and Corrigan, Young, and Markman, JJ.); *Scalise v Boy Scouts of America*, 473 Mich 853 (2005); *In re JK*, 468 Mich 202, 219 (2003) (statement by Weaver, J.); *Gilbert v DaimlerChrysler Corp*, 469 Mich 883 (2003), reconsideration denied by 469 Mich 889 (2003).   Justice Weaver has also provided her own personalized history of this debate in her statement endorsing Justice Hathaway's continued participation in these cases.

[24] The following was part of Justice Hathaway's campaign: "Our Supreme Court is not being fair and impartial. . . .   They are not recusing themselves and that is the problem; we need judges who are going to be fair and impartial in rendering their decisions and that is not happening."   Interview with Lansing State Journal (October 17, 2008).   She quipped that former Chief Justice Taylor was a "walking conflict of interest" because his wife had worked in the Governor's office.   <http://www.youtube.com/watch?v=_7woWJDk1Qg> (accessed June 16, 2009).   It was never alleged that former Chief Justice Taylor's wife stood to benefit financially from her husband's role on this Court, as defendant here suggests that Justice Hathaway's husband will.   See *Adair, supra* at 1028 n 1.   Finally, Justice Hathaway pledged to the people who elected her, "I have, and I will continue to disqualify myself *whenever there is the appearance of impropriety*," League of Women Voters of Michigan Voter Guide 2008 <http://www.lwvmi.org/documents/LWV08SupremeCourt.pdf> (accessed June 16, 2009) (emphasis added), and, "I have a habit of recusing myself if I think that there is even an appearance of impropriety," Interview with Lansing State Journal (October 17, 2008).

Defendant Michigan Catastrophic Claims Association (MCCA) has asserted that Justice Hathaway's husband is a no-fault plaintiffs' attorney who stands to profit in his no-fault practice if Justice Hathaway participates in these cases to overturn a decision made by this Court just months ago. The thrust of this claim is that a reversal of our earlier opinion will remove the legal basis, and thus the incentive, for insurance companies to resist unreasonable no-fault settlements demanded by claimants and their attorneys. Consequently, because insurance companies will be free to pass on these unreasonable settlements to the MCCA (which will eventually be paid for by the public, who must buy no-fault insurance), no-fault practitioners will increase their contingency fee yields by obtaining higher settlements than warranted.[25] A reversal will cost purchasers of Michigan no-fault insurance an aggregate of $693.8 million more this year alone, accounting, in large part, for a more than 19 percent increase in the catastrophic claims premium every automobile no-fault insurance policy issued in this state will bear, which increase the MCCA's board of directors has already approved in anticipation of Justice Hathaway's critical vote to reverse the Court's prior decision. See the affidavit filed by the MCCA in Docket No. 133466, which is one of the documents referred to in fn 2 of this order.

Despite this, and without bothering to explain why, Justice Hathaway simply denies that she should be disqualified, adding that there is no appearance of impropriety in her participation. Justice Hathaway does not even deign to deny that her husband is a plaintiffs' no-fault practitioner or to assert that his practice will not benefit from her participation in a decision to overturn this Court's prior decision.

Justice Hathaway's refusal to live up to her own expressed standard of conduct is worthy of note in its own right: The people of this state deserve to know whether candidates promise one thing when running for office but deliver another when elected. But the far more important issue is the horror that would be visited on this Court if Justice Hathaway's preferred "appearance of impropriety" disqualification standard were actually adopted.

How May a Justice Rebut an "Appearance of Impropriety"?

---

[25] The MCCA is a nonprofit association created by the Legislature to ensure that there are sufficient resources to fund benefits under our no-fault law for the catastrophically injured. See MCL 500.3104. Under our prior decision, the MCCA has authority to reject *unreasonable* claims when a member insurer's policy only provides coverage for "reasonable charges." *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n,* 482 Mich 414, 417 (2008). The MCCA contends that a reversal of the Court's decision will cause a dramatic increase in its exposure and the cost of insurance that it will pass along to the purchasers of no-fault insurance.

Justice Hathaway has provided *no* information in response to defendant's allegations of her family's financial interest in a reversal of the Court's prior decision; surely her terse and conclusory statement is not what the people envisioned when they elected a candidate vowing to adhere to a "higher" "appearance of impropriety" disqualification standard. *Ought not such a standard require that the target of the disqualification motion provide financial statements*[26] *or that an evidentiary hearing be conducted to determine the merit of the allegations of disqualification?*[27]

### What Suffices to Establish an "Appearance of Impropriety"?

According to Justice Hathaway, allegations of a spouse's "economic interest in the subject matter in controversy" or "more than de minimis interest that could be substantially affected by the proceeding"—grounds requiring recusal under MCR 2.003(B)(5) and (6)(c)—are so irrelevant as to not even merit a discussion in her statement*. If these allegations of increased family profit as a result of her participation in these cases do not establish an appearance of impropriety, what would?*[28]

---

[26] During her campaign Justice Hathaway affirmatively supported other financial disclosures: "I believe that there should be disclosure of all election campaign spending." Michigan Campaign Finance Network, Questionnaire for 2008 Michigan Supreme Court Candidates, p 1 <http://www.mcfn.org/pdfs/reports/SCquestionnaire.pdf> (accessed June 16, 2009). Indeed, several member organizations of the Coalition Protecting Auto No-Fault, which has filed an amicus curiae brief in these cases supporting Justice Hathaway's continued participation, supported Justice Hathaway's campaign. The Michigan Trial Lawyers Association and the United Automobile Workers each gave $34,000 to Justice Hathaway's campaign, the maximum allowed by law. During her campaign, Justice Hathaway stated that "a judge should consider[] disqualifying herself in any instance where a party has made a substantial campaign contribution." *Id.* In Justice Hathaway's calculus of disqualification ethics, do such contributions not raise "even the *mere appearance* of impropriety"? *Id.* at 2.

[27] And why, having promised a "higher standard of conduct" if elected, is it defensible for Justice Hathaway to shelter under the Court's historical disqualification practice that she disparaged on the campaign trail?

[28] Moreover, does the fact that the motion for rehearing in these cases was prompted *solely* because of Justice Hathaway's replacement of Chief Justice Taylor and the fact that utterly no new substantive or legal arguments were raised in the motion, as generally required by MCR 2.119(F)(3), give rise to an appearance of impropriety with respect to her participation? See, e.g., *Peoples v Evening News Ass'n,* 51 Mich 11, 21 (1883), in which this Court opined that "a rehearing will not be ordered on the ground merely that a change of members of the bench has either taken place or is about to occur."

Who Will Determine Whether There Is an "Appearance of Impropriety"?

For the first time to my knowledge, members of the Court have participated in the merits of a disqualification decision on a motion addressed to another justice. Although Justices Cavanagh and Weaver and Chief Justice Kelly have joined *and endorsed* Justice Hathaway's decision, they have done so *solely* on the basis of Justice Hathaway's statement without any additional inquiry into the merits of her participation or the allegations raised. In this, their participation is merely a rote ratification of Justice Hathaway's cursory denial of the motion to disqualify.

The new majority's approval of and participation in the merits of the determination whether Justice Hathaway should be disqualified, while an alteration of our traditions, *is* consistent with several of the Court's pending disqualification proposals that require full Court participation or that of the Chief Justice.[29] Without question, lodging such a determination with other justices of this Court will, at best, lead to gamesmanship to change the philosophical composition of the Court to alter the result in each such case. I ask: Would a 4-3 decision by the members of the Court favoring participation of a challenged justice cause the public to have greater or lesser faith that the targeted justice should ethically participate?

*How would such a procedure better serve the people of this state than the nearly 200-year-old current disqualification practice*?

These are but a *few* of the questions raised by Justice Hathaway's disposition of the pending motion to disqualify her. Given Justice Hathaway's campaign promises and our colleagues' published statements on disqualification over the years, not only the parties, but the public deserve more.

MARKMAN, J. Defendant has moved for Justice Hathaway's disqualification, arguing that "her spouse has an interest that could be substantially affected by the outcome of the proceedings." Justice Hathaway now denies this motion, concluding that she has "no personal bias or prejudice," that there is "no appearance of impropriety," and that there is "nothing alleged . . . that would cause any reasonable person to believe that there is a significant and disproportionate influence being asserted upon me," with little to no explanation. This decision must be viewed against a backdrop in which Justice

---

[29] It is unclear why Justice Hathaway and the new majority chose to adopt some aspects of the new proposals while claiming to adhere to our current disqualification practice. As stated, Justices Cavanagh and Weaver and Chief Justice Kelly have *never*, to my knowledge, publicly endorsed the decision of another justice targeted with a disqualification motion, as they have done here. However, because they considered nothing beyond Justice Hathaway's statement, it is hard to understand what their endorsement adds, other than being a statement of solidarity.

Hathaway has been free in her criticism of other justices for their disqualification decisions. (For example, asserting that the former Chief Justice of this Court was a "walking conflict of interest" because his wife worked for the Governor's office; stating that "our Supreme Court is not being fair and impartial . . . they are not recusing themselves and that is the problem; we need judges who are going to be fair and impartial in rendering their decisions and that is not happening"; and proclaiming that, "I have, and I will continue to disqualify myself whenever there is the appearance of impropriety.")[30] Justice Hathaway has also supported this Court's decision to propose new procedures that would require disqualification whenever there is an "appearance of impropriety." ADM File No. 2009-04; see 483 Mich 1205 (2009). Finally, the United States Supreme Court's decision a few weeks ago in *Caperton v A T Massey Coal Co, Inc,* 556 US __; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), held that disqualification must now be determined on the basis of "objective standards."

Given this backdrop, it is difficult to understand why Justice Hathaway believes that her conclusory response to defendant's motion is sufficient. Contrary to her justification for her unwillingness to explain her position ("I will not participate in this Court's practice of engaging in responses to comments of others which are inappropriate and unnecessary. This Court should discontinue devoting the state's limited resources to unproductive colloquy."), it is hardly to take the high ground for a justice to decline to address questions that have been raised by the parties and by other justices, and that are a direct outgrowth of that justice's own reform proposals, her own criticisms of other justices, and a recent decision of the United States Supreme Court. Given that *Caperton* was decided just a few weeks ago*,* and in fairness to the parties, I would direct the filing of supplemental briefs. Among the questions I would direct the parties to address are whether all justices must now participate in deciding another justice's disqualification and whether the justice who is the object of disqualification may even participate. Absent such briefing, I am not yet prepared to deviate from this Court's practice of 172 years to the contrary. Therefore, I neither participate in nor address the merits of Justice Hathaway's decision not to grant defendant's motion.

---

[30] <http://www.youtube.com/watch?v=_7woWJDk1Qg> (accessed June 18, 2009); Interview with Lansing State Journal, October 17, 2008; and League of Woman Voters of Michigan Voter Guide 2008 <http://www.lwvmi.org/documents/LWV08SupremeCourt.pdf> (accessed June 18, 2009), respectively.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

July 21, 2009

_____
Clerk